HAIAH FEIGE DUBERSTEIN

*v.*

ISAAC DUBERSTEIN.

*Opinion filed December 22, 1897—Rehearing denied February 4, 1898.*

1. DIVORCE—*condonation is a stricter bar against husband than against wife.* Condonation of the wife's offense by the husband is a stricter bar against the procuring of a divorce than is condonation by the wife of the husband's offense.

2. SAME—*condonation is conditioned upon non-repetition of the offense.* Condonation is regarded as resting upon an express or implied agreement granting forgiveness for an offense upon the condition that it will not be repeated.

3. SAME—*husband seeking divorce for cruelty must make out a clear case.* Where a husband seeks a divorce upon the ground of the wife's extreme and repeated cruelty, he must make out a clear case.

4. SAME—*slight acts of violence by wife are not extreme cruelty.* Slight acts of violence by the wife are not sufficient to make out a case of extreme and repeated cruelty, in the absence of reason for supposing that the husband cannot protect himself.

5. SAME—*recrimination defined.* Recrimination is a counter-charge by the defendant in a divorce suit, of a cause of divorce against the complainant.

6. SAME—*divorce is a remedy provided for innocent party, only.* Divorce is a remedy provided for an innocent party, and when each party has cause for divorce against the other, of the same statutory character, neither can be granted a divorce.

7. SAME—*extreme and repeated cruelty is a sufficient recriminatory defense to like charge.* A defendant charged with extreme and repeated cruelty may show in defense the complainant was equally cruel.

8. SAME—*where both parties are guilty of cruelty neither can obtain a divorce.* The court reviews the evidence in the case, and reverses the decree granting the husband a divorce for the wife's cruelty, and holds that the evidence shows that both parties were guilty of cruelty and that neither is entitled to a divorce from the other.

*Duberstein* v. *Duberstein,* 66 Ill. App. 579, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

This is a bill for divorce, filed on November 29, 1895, in the circuit court of Cook county by the appellee, Isaac Duberstein, against his wife, the appellant, Haiah Feige Duberstein, seeking a divorce from her upon the charge of extreme and repeated cruelty exercised by her towards him. An answer was filed by the defendant below, the appellant here, denying the charge of cruelty so made against her, and denying the specific acts of cruelty set up in the bill. The answer also pleaded condonation of the acts of cruelty set forth in the bill; and it furthermore made a counter-charge of cruelty against the complainant below, the appellee here, and specified particular acts of cruelty on the part of the complainant in support of the counter-charge. By leave of court an amended answer was filed in place of the original answer. The replication was filed to the amended answer on March 10, 1896. On April 25, 1896, a motion was made by the defendant below for a jury trial, which motion was continued. There is nothing in the abstract filed to show how this motion was disposed of. But the cause went to a hearing before the judge without a jury, and, so far as can be ascertained from the abstract, without objection by the defendant below, although a motion to submit the case to a jury was made after all the evidence had been introduced on both sides, and after the arguments had been heard, and after the court had taken the cause under advisement. Testimony was taken on behalf of the complainant to sustain the charge of cruelty, and on behalf of the defendant to sustain the counter-charge of cruelty. The court rendered a decree, sustaining the allegations of the original bill, and granting to the complainant therein, the appellee here, a divorce upon the ground that the defendant, the appellant here, had been guilty of extreme and repeated cruelty towards her husband. The decree of the circuit court has been affirmed by the Appellate Court; and the present appeal is prosecuted from such judgment of affirmance.

MOSES, ROSENTHAL & KENNEDY, and PAM & DON-
NELLY, for appellant.

ZOLOTKOFF & ZOLINE, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the
court:

The Appellate Court, in its opinion filed in·this case,
summarizes the acts of cruelty, charged by the appellee
against the appellant, as follows: "1. The throwing of a
chair in January, 1886, on Mr. Duberstein, inflicting a seri-
ous injury on his side.  2. The drawing of a knife upon
him in the fall of 1888 without injury to him.  3. The
throwing of an iron stove-cover at him, striking his head
and inflicting serious injury in April, 1891.  4. Use of vio-
lent and abusive language and threats in August, 1894,
and at other times previous thereto.  5. Striking Mr. Du-
berstein with an ornament stone in April, 1895, and throw-
ing chairs and cuspidor at him, inflicting two wounds on
his head; that he was under the care of a physician and
compelled to undergo an operation."

From an examination of the pleadings and the evi-
dence, we are inclined to regard the summary thus made
by the Appellate Court as correct.  So far as the fourth
charge as to the use of violent and abusive language is
concerned, it may be said that this charge constitutes no
sufficient ground for divorce.  As to the first three acts
of cruelty, charged by the appellee against the appellant,
as specified in the above summary, the evidence shows
that they were all condoned by the appellee.

The appellee makes the following statement in his tes-
timony: "Commencing from January now, we lived for
about four or five weeks very happily, and I brought all
my money home.  *  *  *  It was 1895, instead of 1894,
when we lived happily for four or five weeks; in January
or February."  For reasons founded in the conjugal rela-
tion, and in view of the difference in the duties respectively

required of the husband and wife in the domestic establishment, a less stringent rule is held against her than against him, so far as inferences of condonation are concerned from the overt acts of the parties respectively. The authorities hold, that condonation is not so strict a bar against a wife as against a husband, inasmuch as she may find it difficult to quit the common domicile, and often submits through necessity. Hence, condonation on the part of the wife is not pressed with the same vigor as condonation on the part of the husband. (*Phillips* v. *Phillips*, 1 Ill. App. 245; *Home* v. *Home*, 72 N. C. 530; *Reese* v. *Reese*, 23 Ala. 485; *Davies* v. *Davies*, 55 Barb. 130; *Sterling* v. *Sterling*, 12 Ga. 201). The converse of the rule must be true, that condonation is a stricter bar against the husband as against his wife, than it is against the wife as against her husband; and condonation by the husband will much more readily be relied upon as a defense in favor of the wife, where she repeats the offense condoned. The testimony here establishes a condonation by the appellee of the acts of cruelty charged against his wife, which are alleged to have taken place prior to April, 1895. In view of such condonation we do not deem it necessary to discuss the acts of cruelty taking place before April, 1895. The testimony in support of them comes principally from relatives and employes of the appellee. They are denied by the appellant, both in her answer and in her testimony; and many circumstances, unnecessary to be here dilated upon, tend to support her denial. But whether such prior charges of cruelty against her are sustained or not, it is virtually conceded on the part of the appellee, that the testimony as to what occurred in January and February, 1895, amounted to a condonation of such offenses, unless the right to rely upon them was revived by the alleged conduct of appellant in April, 1895.

Appellee insists that in April, 1895, appellant was guilty of such acts of cruelty towards him as to do away with the effect of the previous condonation. The general

rule is, that a repetition of the same injury does away with the condonation and revives the former injury. If, after forgiveness of the offense charged, the defendant has given to the complainant no just cause for complaint, the forgiveness will be a good defense, but if the condition is broken, it will be no defense; hence it has been said that all condonation is in a sense conditional, and involves an express or implied agreement, that the party, who forgives the other, does so only on the condition that the party forgiven will not repeat the offense. (5 Am. & Eng. Ency. of Law, p. 821, note 1, 823; *Johnson* v. *Johnson*, 4 Paige's Ch. 460; *Yates* v. *Yates*, 2 Beas. 281; *Kennedy* v. *Kennedy*, 87 Ill. 250).

The question then arises, whether the act of cruelty charged by the appellee as having taken place in April, 1895, had the effect of reviving the acts of cruelty, which occurred before that date, and which were condoned in January and February, 1895, so as to justify the appellee in relying upon such previous acts of cruelty in support of the charge made in his bill.

Appellee swears, fixing the date at one time in the early part of April, 1895, and at another time in the middle of April, 1895, that one Sunday he came home about noon and went to bed; that his wife looked under his pillow for his vest as usual (to get his money); that he pushed her away; that he pulled the cover over his head; that she took a stone ornament, called a sea-shell, which was in the room; that there was a blow on his head; that she made two holes in the back of his head; that he commenced to cry and halloo for help; that he stayed in the house a little while the next morning and then went for a doctor; that he lived with her a week after that, but did not after that occupy the same bed with her or cohabit with her. Appellant swears, in regard to this transaction, that upon the occasion referred to, in April, 1895, appellee came home very drunk; that he climbed up the stairs; that she heard somebody fall down and opened

the door and saw it was her husband; that she took him by the hand and led him up and put him in bed and he fell asleep; that it was three o'clock in the afternoon; that she went back to see how he was getting along, and found him awake in bed; that he gave her a slap in the face; that the blood ran from her teeth; that she saw he was drunk and paid no attention; that she told him to rest and sleep—that he did not know what he was doing; that he ran out from the bed and beat her about the shoulders, and tore her wrapper, and began to drag her about by the hair, and threw her on the floor; that she ran into the kitchen; that he ran after her and fell; that, when she saw him fall, she came back; that he fell in the middle of the room between the parlor stove and the bureau, a very narrow place, and an ornament was there; that she tried to lift him up and seat him on the chair; that his head was bleeding; that she got so frightened that she ran to the landlady and told her her husband had fallen down and hurt his head, and she was afraid he would faint; that she told the landlady he was drunk; that she found the daughters of the landlady, and asked the older one to go for the doctor, but the doctor was not at home; that he laid down in bed again and went to sleep; that she remained in the house that night. She also says: "I never struck him with the ornament that was here yesterday. I never said a bad word to him. I loved him. I never beat him. He used to beat me when drunk."

It is sought to support the testimony of the appellee in regard to this occurrence by that of one of his employes named Rubinstein who had worked for him, he being a tailor. But this witness did not see him until the Friday night after the Sunday on which the occurrence took place; and to this witness the appellee stated at that time, that "he got hurt by a gas fixture." It is also sought to sustain the testimony of the appellee by that of one of the daughters of the landlady, who came up to the apartment soon after appellee was hurt. This witness states,

that she found the appellant sitting on the stairs with her hair down, and that she found the appellee in the sitting room with his coat off and blood on his face; that appellant went up and got her things on and said she would go for the doctor, but changed her mind and did not go. After an examination of all the testimony in regard to the occurrence which took place in April, 1895, we are unable to say that the circumstances, which tend to substantiate the account of it given by the appellee, are entitled to any more weight than those which tend to substantiate the account of it given by the appellant.

It is now a settled rule in this State, that, where the husband asks for a divorce from his wife upon the ground of extreme and repeated cruelty, he must make out a clear case; and it is not sufficient for him to show slight acts of violence on her part towards him, so long as there is no reason to suppose that he cannot protect himself by a proper exercise of his marital powers. (*De LaHay* v. *De-LaHay*, 21 Ill. 252; *Fritz* v. *Fritz*, 138 id. 436; *Aurand* v. *Aurand*, 157 id. 321). We are unable to say, that the appellee has established the acts of cruelty alleged to have taken place in April, 1895, with such clearness, as to justify us in holding that they operated to annul and set aside his condonation of such previous acts of cruelty on her part as may have occurred, or to revive such acts of cruelty as legitimate grounds for a divorce. In addition to all this, the appellant swears with great positiveness, that the appellee did not leave her until June, 1895, and that, on November 7, 1895, he came home at one o'clock in the morning and was kind to her, and stayed at home; that they then cohabited together; that he stayed the whole night and went away at six o'clock the next morning, going away stealthily. He denies that he visited her on November 7, 1895; her oath stands over against his in regard to this matter. We are unable to find any evidence, tending to contradict her statement, or to sustain his, in regard to this visit of November 7, 1895. The tes-

timony of the landlady confirms the appellant, so far as to state that the appellee was in her apartment in June, 1895. If the testimony of appellant is true, then the cohabitation, which took place on November 7, 1895, cannot be regarded otherwise than as a condonation of the act of cruelty, which is alleged to have been committed in April, 1895. The appellant testifies with great positiveness as to acts of cruelty committed previous to April, 1895, by her husband against her. She states that he would leave her for a month or more at a time without money; that he would come home drunk; that he would beat her; that he would drag her around the room by her hair, etc. She states that on October 27, 1893, he gave her a kick with his foot, and took her by the hair, and dragged her to the door of his shop, and told her to go away; that she lay there, until the landlady came down, and found her lying at the door, and told her to go home, which she was unable to do because of being weak and exhausted; that appellee said upon that occasion: "Let her lay; if she dies I will get rid of her quicker;" that the landlady took her home; that she was unable to get up stairs; that the landlady called another woman and they took her up stairs; that Dr. Henn was then called and treated her one week. The appellant is contradicted in regard to this occurrence in October, 1893, by two men who were working for the appellee. But it appears from the testimony of Dr. Henn, that, on October 27, 1893, he was called to attend the appellant, who lived just across the street from him; that, when he went to see her, she was quite excited; that she was lying on the bed in her nightgown; that she was bruised in several parts of the body, sides, limbs, and on her arms; that some of these bruises were small, and some were large; that the large ones were on the leg; that he called there every day in the week.

But there is testimony which sustains the appellant in her statement that her husband was guilty of cruelty towards her.

Lena Schneider swears, that she knew appellant in Russia and after she came to America; that she visited her on one occasion, and, while there, appellee came home to supper; and, upon her asking him if he wanted something to eat, he went to the table and told her to go to hell; that he sat by the corner of the table and told her he was going away; that she said in his presence that he hit her and she couldn't stand it; that he took up a chair and swung it, and, upon her remonstrating with him, he said, "If you don't like that, go away." This witness also says, that, about four years before the time when she testified, she visited appellant one evening, and, while she was there, the appellee took hold of appellant and beat her with his fists on her body and her head; that he hit her in the head and neck.

Mrs. Bauer, the wife of a Jewish rabbi, says, that appellee and appellant lived in a house belonging to her for about six months; that witness used to visit them; that one night she heard a noise and she and her husband went out to see what was the matter, and saw appellant; that appellant took off her shoes and stockings and showed witness marks, blue and green on her hands and feet, but would not tell what was the matter; that she was sick in bed but that her husband was not at home; that she moved to another house, and was afraid to go home and sleep with her husband, and would take the child of witness to sleep with her; that perhaps ten or twelve times she came to witness' house about twelve o'clock at night; that, upon one occasion, witness went to her house and found her in bed and the doctor there; that she was nearly killed; that witness examined her and she was hurt on her feet and hands.

Rose C. Shutan swears, that appellant's husband used to come home late; and appellant came to her in the evening because she was afraid to sleep until her husband came; that, upon one occasion, he came home at four o'clock in the morning; that they made a good deal of

noise; that she got a lamp to see what was the matter, she living then in the same house with appellant; that appellant was on the steps in her night-gown, and hallooed; and her husband went out and caught her and dragged her back in the house; that her face looked as if it had been beaten; that they went back in the house and locked the door; that this was about two years before the time when the witness testified; that the witness saw Dr. Schlesinger come to the house. This witness says: "Mr. Duberstein struck Mrs. Duberstein, and dragged her back by the hair; I saw him; he asked her to come in, but, while he asked, he dragged her back by the hair."

Mamie Sudowich swore, that she had known appellant ever since she was a little girl; that she lived with them five months on Ashland avenue; that she worked at cloak making in their house; that the shop was down stairs, and the house up stairs; that appellant always treated him well and he always treated her badly; that, when he ate, he would throw dishes on the floor and some at her; that he called her bad names. This witness says: "Sometimes he would lick her; sometimes he struck her with his fists, and sometimes took her by the hair, and I didn't want to see it, so I got out; I never saw her do anything to him; she was always afraid; I saw her body, legs, arms and hands, where she was hurt."

Herman Bergawitch swears, that he worked for Duberstein in January, 1888, and in Benton Harbor in 1889; that he lived with them about a month; that appellant was very kind to her husband while he was there; that, when they lived on Canal street, he saw appellee throw a pair of scissors at appellant; that he tried to strike her but failed; that the scissors were about ten inches long and went near her side; that, on the last day they were at Benton Harbor, they quarreled; that he took the poker and threw it at her and struck her on the chest.

Jennie Karp swears, that she had known appellant four years and lived across the street from her on Ash-

land avenue, visited her house every day; that appellee never treated her properly; that she used to talk kindly to him and he was always gruff; that she gave him some tea once and he took the cup of tea and threw it at her; that he spilt it over her from behind, and took a stone and threw it at her; that one night at one o'clock she opened the door and appellant was in a torn wrapper, beaten and bruised and crying; that witness invited her to sleep at her house; that her face and arms were all torn and blue.

Sarah Muskovitsch swore, that she had known appellant three years; that she had attended her at her house on Milwaukee avenue three years, ago; that appellant was then hurt on the head and body; that witness gave her medicine under the instructions of the physician; that she was with her two weeks; that she was in bed one week, and had blue and green marks on her.

B. Rubenzik swore that he knew the parties; that he was in their house at one time when appellee got mad, and pushed a table against appellant, and she fell down from her chair.

Morrits Levitz swore, that he was a tailor, and at one time worked for appellee, and saw him pull appellant by the hair once, and she cried.

One Henry L. Marks, a lawyer, testified that, at one time, he lived across the street from appellee, and on one evening appellant came to where he was living without a hat and called for help; that her face was cut; that he went out with her and over to where appellee lived; that his mother came out and commenced to halloo; that witness threatened to have her arrested if she did not admit appellant into the house; that appellee was there and said: "We don't want her, throw her out;" that witness went down the next morning and swore out a warrant for appellee and old Mrs. Duberstein for assault.

In view of the testimony thus introduced by the appellant, some observations upon the defenses, known in the books as justifiable conduct and recrimination, are pecu-

liarly appropriate. It is manifest that, even if appellant was guilty of acts of cruelty towards appellee, appellee was guilty of acts of cruelty towards appellant. "A party charged with cruelty may justify himself or herself by showing that the other party was equally to blame. * * . * The law is for the relief of an oppressed party, and the courts will not interfere in quarrels where both parties commit reciprocal excesses and outrages." (5 Am. & Eng. Ency. of Law, p. 796; *Durand* v. *Durand*, 4 Mart. 174). We think that, if appellant was to blame, appellee was equally to blame.

Recrimination is defined to be "a counter-charge by the defendant of a cause of divorce against the complainant." (5 Am. & Eng. Ency. of Law, 824). Many authorities lay down the rule that, when each party has a cause for divorce, neither can obtain relief. The authorities differ as to whether, when the complainant alleges one cause as a ground for divorce, the defendant can set up another cause in defense. Some of the authorities hold, that any cause for divorce is generally a good defense against any other, even though they be causes for different kinds of divorce. But other authorities hold, that the offense set up in defense must be of the same statutory kind as the offense charged in the bill. In the case of *Bast* v. *Bast*, 82 Ill. 584, we said: "The grounds alleged for reversing the decree in this case are that the decree is not sustained by the evidence, and that appellee himself had deserted his wife, giving to her the right to claim a divorce from him. We do not think his desertion can exonerate the wife from the more serious charge of adultery. Neither that, nor drunkenness, nor cruelty will, under our statute, constitute a sufficient recriminatory defense to a charge of adultery. Had appellee been guilty of a like offense, he could not claim a divorce." In the case at bar, appellee was guilty of a like offense, to-wit: cruelty, with that with which he charges appellant. In *Beck* v. *Beck*, 63 Tex. 34, which was a suit for

divorce brought on the ground of cruel treatment, where the evidence showed that both the wife and her husband had frequent altercations, and that at least on one occasion one party gained the ascendency and beat and bruised the other severely, it was held, that there was such recrimination on the part of the complainant, as would prevent the granting of a divorce in accordance with the prayer of the bill. Divorce is a remedy provided for an innocent party; (5 Am. & Eng. Ency. of Law, 825, note 6); so that, when each party has committed a cause for divorce, the causes being of the same statutory character, neither can complain of the other. Here, it cannot be said, in view of the testimony already quoted, that the appellee is an innocent party. He alleges in his bill, that "during the time he lived with appellant he conducted himself as a kind and indulgent husband." This allegation is not sustained by the proofs. (*Rivet* v. *Rivet*, 39 Ala. 348; *Smith* v. *Smith*, 4 Paige's Ch. 432; *Pastoiel* v. *Pastoiel*, 6 Mass. 276). In discussing this subject Mr. Bishop in his work on Marriage, Divorce and Separation, says: "There is a rule which forbids redress to one for an injury done him by another if himself in the wrong about the same thing whereof he complains." This doctrine is applicable in the divorce law. (2 Bishop on Mar., Div. & Sep. secs. 344, 346, 365-367, 381, 409). It is peculiarly applicable to the facts of this case. If equal credence be given to the testimony of the appellee and to the testimony of appellant—and we see no reason why the testimony on one side is not entitled to as much credit as the testimony on the other side—it must be said, that the parties here are *in pari delicto*, and therefore must be left to themselves. (*Horne* v. *Horne*, 72 N. C. 530).

The judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the circuit court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*