ROY MOGGED, Plaintiff-Appellant, *v.* WILMA DORIS MOGGED, Defendant-Appellee.

(No. 71-134;

Third District—May 31, 1972.

Kenneth L. Richmond, of Dyer, Richmond, Moore & Nelson, of Hoopeston, for appellant.

Richard J. Doyle, of Manion & Doyle, of Hoopeston, for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from the Circuit Court of Iroquois County in which the Court, following a bench trial, entered a decree granting a divorce to both parties to the action. The original complaint of the husband and the counterclaim of the wife both allege extreme and repeated mental cruelty as grounds for relief. Roy Mogged, plaintiff-counterdefendant and appellant herein, appeals from that decree and also from certain other orders entered in the cause.

■■ We have carefully examined the report of proceedings in the trial court, and we believe it sufficient to say in that respect that the evidence there adduced adequately established extreme and repeated mental cruelty on the part of each party to this action toward the other. We also believe the evidence heard by the trial court may well be characterized as establishing that the marriage of the parties to this cause is as a practical matter, irretrievably lost. Since evidence is of no immediate concern to anyone except the parties and their children, we deem it unnecessary to summarize it here.

The real question involved in this case is whether the doctrine of recrimination in Illinois, as typically announced in *Duberstein v. Duberstein* (1897), 171 Ill. 133, should be maintained inviolate, thus automatically precluding the divorce of parties who have each been guilty of marital misconduct of equal stature toward the other, or whether that doctrine must be reexamined, and, in the light of present day reality, be rejected as unsound.

In 1897, the Illinois Supreme Court in *Duberstein* (171 Ill. at 144), quoting from 5 Am. & Eng. Ency. of Law, p. 796, announced the doctrine of recrimination thusly: "'A party charged with cruelty may justify himself or herself by showing that the other party was equally to blame * * *. The law is for the relief of an oppressed party, and

the courts will not interfere in quarrels where both parties commit reciprocal excesses and outrages.'" That court also said (at 145): "[d]ivorce is a remedy provided for an innocent party; (5 Am. & Eng. Ency. of Law, 825, note 6); so that, when each party has committed a cause for divorce, the causes being of the same statutory character, neither can complain of the other."

■■ As observed in *Standard v. Stanard* (1969), 108 Ill.App.2d 240, 247 N.E.2d 438, 441, "[g]enerally, a recriminatory offense must be of the same character as the ground for divorce (*Levy v. Levy* (1944), 388 Ill. 179, 186, 57 N.E.2d 366); and a divorce on the ground of adultery is not barred by a defense of cruelty (*Peck v. Peck* (1959), 16 Ill.2d 268, 278, 279, 157 N.E.2d 249; 73 A.L.R.2d 723); habitual drunkenness (*Zimmerman v. Zimmerman* (1909), 242 Ill. 552, 558, 90 N.E. 192); desertion (*Nesheim v. Nesheim* (1938), 293 Ill.App. 257, 260, 12 N.E.2d 222); or other statutory grounds (*Decker v. Decker* (1901), 193 Ill. 285, 294, 61 N.E. 1108, 55 L.R.A. 697.) However, adultery is a good defense to any other statutory ground for divorce, including the charge of adultery. *Decker v. Decker supra; Kovac v. Kovac* (1960), 26 Ill.App.2d 29, 54, 167 N.E.2d 281 * * *."

The practical weakness of the doctrine has been expressed by courts which nonetheless felt compelled to apply it; (*e.g., Wells v. Wells* (N. J. Super. 1962), 180 A.2d 356; and the overwhelming weight of the commentary with respect to the doctrine is critical, advocating its modification, or indeed, its abolition. See Bodenheimer, *Reflections on the Future of Grounds for Divorce,* 8 J. Family Law 179 (1968); Goldstein and Gitter, *On Abolition of Grounds for Divorce: A Model Statute and Commentary,* 3 Family L. Q. 75 (1969); Moore, *Recrimination; an Examination of the Recrimination Doctrine,* 20 S.C.L., Rev. 685 (1968); Raskin and Katz, *The Dying Doctrine of Recrimination in the United States of America,* 35 Can. B. Rev. 1046 (1957); Zacharias, *Recrimination in the Divorce Law of Illinois,* 14 Chi-Kent L. Rev. 217 (1936).

It has been said by two Illinois commentators (Neumark and Levinson, *Marital Law in a Changing Society,* 57 I. B. J. 902, 905 fn. 21 (1969) ) that "[t]he origin of the defense [of recrimination] is unknown, [but] it may have sprung from Deuteronomy XXII, verses 12-19 but is not mentioned by Maimonides in his work. (See Maimonides, *Guide for the Perplexed,* Dover Publication, 2d Ed 372 (1891).) The earliest cases available are *Proctor v. Proctor,* 2 Hagg. Const. 292, *Beeby v. Beeby,* 1 Hagg. Const. 789, 3 Eng. Ecc. 338. It is not statutory [in Illinois] and apparently proceeds from the clean hands rule in equity or the Breach of Contract Rule in Law * * *."

Recognizing at least somewhat the manifest harm resulting to individ-

uals and society from maintaining the existence of irretrievably lost marriages, whenever evidence of recrimination was adduced before the courts, our legislature in 1967 added Section 8a to the Divorce Act, which specified that the fault or conduct of the plaintiff in a divorce action is not a bar to the action unless raised by the pleadings. (Ill. Revised Statutes, 1967, Ch. 40, §9a). In the *Stanard* case, *supra*, the court stated that this section was applicable to all recriminatory conduct, including adultery, and a plaintiff shown by the evidence to have committed adultery might nonetheless obtain a decree for divorce absent his spouse's plea and proof of plaintiff's recriminatory adultery.

Even with this statutory amelioration, however, our divorce laws, as exemplified by the decisions cited earlier herein, yet manifest the attitudes which prevailed in the ecclesiastical courts of early England (See *e.g. Forster v. Forster* (1790), 161 Eng.Rep. 504, which courts until approximately 1857, retained exclusive jurisdiction over the law of divorce. (See: Holdsworth, *A History of English Law*, 622 (1938).) The views of those courts, while largely based upon religious precepts, were nonetheless borrowed in substantial part by the civil courts over the years, both in this country and in England. In liberally deriving the civil law of divorce from the doctrines established in the ecclesiastical courts, it would seem clear that concepts both erroneous and inapplicable had been erected, for, as noted by the California Supreme Court in *DeBurgh v. DeBurgh* (Cal. 1952), 250 P.2d 598, 601 "* * * ecclesiastical authorities are not relevant in view of the fact that ecclesiastical courts could not grant absolute divorce. They could decree only limited divorce, equivalent to a judicially recognized separation. Such a court's action was usually limited to a determination of certain property rights of the parties or the husband's duty of support. It is not surprising, therefore, that ecclesiastical lawyers placed emphasis upon the comparative guilt of the parties * * *."

In any event, however, both religious and secular views of marriage and divorce have changed substantially since the early days of the ecclesiastical courts. At least, as a practical matter, it is generally recognized in the United States today that divorce does not necessarily imply the existence of opprobrious conduct by the parties to it, but rather may simply be the result of the total breakdown of the relationship of the parties which led to the creation and continued maintenance of their marriage. As noted some years ago by a justice of the Supreme Court of Appeals of West Virginia (*Hatfield v. Hatfield* (W.Va. 1932), 167 S.E. 80, 91—92), with whose observation we find ourselves in total agreement, "* * * we must not lose sight of the fact that the parties in a divorce proceeding differ from those in the ordinary civil suit or action. In the

former cause, the state looks to the trial chancellor as a protector of its interest in an orderly society, in the welfare of the children which might be affected by a divorce decree, as well as the welfare of every citizen; hence it would seem a strict application of the clean hands doctrine, without more, is merely a punishment of the litigants, and omits consideration of the interests of those innocent but who are adversely affected by a decree which leaves the parties in the situation where they have placed themselves. Divorce is the climax of domestic discord; the affections which united the parties in marriage have disappeared, and hate and disharmony have loomed in their places. To compel two persons to live together under such circumstances would seem to do violence to the moral sensibilities of an enlightened age. If time evinces mistake to the errant parties, the law permits them to remarry; if not remarriage to each other, then perhaps a lost paradise regained through another marriage. Is not the interest of society generally best subserved by a dissolution of the marital status and the possibility of future respectability through remarriage rather than [by] a pretended legal cohabitation attended by probable promiscuity to satisfy the human passions? Courts which administer the divorce laws should not close their eyes to the physiological and sociological imperfections of mankind."

We further agree with the California Supreme Court's statement as to the proper role of the courts in divorce proceedings insofar as recrimination is concerned: *viz.* "* * * the court must consider not merely the rights and wrongs of the parties as in contract litigation, but [also] the public interest in the institution of marriage. The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people. Since the family is the core of our society, the law seeks to foster and preserve marriage. But when a marriage has failed and the family has ceased to be a unit, the purposes of family life are no longer served and divorce will be permitted. '[P]ublic policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed.'" (*DeBurgh v. DeBurgh* (Cal. 1952), 250 P.2d 598, 601; quoting in part from *Hill v. Hill* (Cal. 1943), 142 P.2d 417, 422.) For a collection of authorities on this point, see Annotation: Power of Court to Grant Absolute Divorce to Both Spouses Upon Showing of Mutual Fault, 13 ALR.3d 1364; see also Judge Drymalski's memorandum opinion in *Renn*

*v. Renn,* case No. 68-D-9018 in the Circuit Court of Cook County, Divorce Division.

██ Appellant, however, argues that, notwithstanding the conceded mischief done by a routine application of the doctrine of recrimination, it is nonetheless settled law in the State of Illinois and should accordingly not be disturbed by the courts. Rather, argues appellant, if it is to be changed, it must be altered by the legislature. We have heretofore observed herein that the doctrine is a product of judicial decision in Illinois, and we believe its existence may have merely been assumed by the legislature over the years in enacting and amending the Divorce Act. In any case, however, since the doctrine was founded by the judiciary in Illinois, it follows that it may be abolished or modified by the courts if such change is warranted See *Molitor v. Kaneland Comm. Unit Dist.* (1959), 18 Ill.2d 11, 26.

██ We further believe, appellant's argument to the contrary notwithstanding, that the legislature did not intend to codify the doctrine in enacting Section 1 of the Divorce Act, which contemplates that a divorce may be granted to the "injured party" if the requisite grounds for the decree are proven. (1969 Ill. Rev. Stat., ch. 40, par. 1.) Clearly, both parties to a divorce action may be, as we believe has been shown here, "injured parties"; and the use of the singular in the section of the Act describing the causes for divorce in our judgment does not preclude the courts from recognizing that fact where appropriate. Notably, Section 10 of the Divorce Act, prior to the enactment of the 1967 amendment thereto, specifically precluded a divorce on recriminatory grounds only where both parties had been guilty of adultery, and then only when adultery was the ground of complaint. (1965 Ill. Rev. Stat. ch. 40 par. 11.) In 1967, Section 10 was amended to delete any reference to recriminatory adultery. 1967 Ill. Rev. Stat. ch. 40, par. 11.

██ There is thus, in our judgment, no legislative impediment to the granting of the decree appealed from herein. In our view what was said by the Florida Supreme Court in *Stewart v. Stewart* (Fla. 1947), 29 So.2d 247, 248, should now and hereafter also be deemed the law of Illinois: "The application of the doctrine of recrimination like the doctrine of clean hands is a matter of sound judicial discretion dependent on public policy, public welfare and the exigencies of the case at bar." (See also *Flagg v. Flagg* (Wash. 1937), 74 P.2d 189, *Hoff v. Hoff* (Mich. 1882), 112 N.W. 160; *Burns v. Burns,* (Mont. 1965), 400 P.2d 642.) Such discretion, in the nature of things, must necessarily take into consideration many factors in a given case, some of which have been enumerated by the California Supreme Court in *DeBurgh v. DeBurgh, supra, i.e.,* the

prospect of reconciliation; the effect of the marital conflict upon the parties and upon third parties such as the litigants' children, and the comparative guilt of the parties. The *DeBurgh* list is of course by no means exhaustive, and the circumstances of each particular case may well necessitate the consideration of other factors not mentioned therein. Suffice it to say that courts have been called upon to exercise judicial discretion with respect to various matters since the advent of the common law, and we do not believe they will be found wanting in that respect in the area discussed herein.

It must be admitted that what we say here is in conflict with our Supreme Court's 1897 decision in *Duberstein v. Duberstein*, 171 Ill. 133, the leading Illinois decision on the doctrine of recrimination. However, we can find no subsequent case decided by the Supreme Court where it was specifically asked to reexamine its views as expressed in that case. We note that *Duberstein* has not been cited as authority by the Supreme Court since 1944, in *Levy v. Levy*, 388 Ill. 179, where *Duberstein* was apparently last approved by that court. While the *Duberstein* doctrine was recognized as yet existing by the Supreme Court in *Peck v. Peck* (1959), 16 Ill.2d 268, that case served only as a vehicle for the approval of an exception to the application of the doctrine of recrimination, *i.e.* a charge of adultery may not be recriminated by virtue of the complaining party's having engaged in conduct amounting to other grounds for divorce, such as cruelty. Again in 1960 the Supreme Court (*Curran v. Curran* (1960), 19 Ill.2d 164, 169) referred to the existence of the doctrine but further restricted its application in observing that: "\* \* \* [i]t is difficult to say how much ill-behavior, by a party otherwise entitled to a divorce, will bar him of his right thereto in a particular case. In deciding such questions the court must necessarily look to see which of the parties was first to blame; and if the evidence shows that the acts relied upon consist mainly of resistance to ill-treatment or assault by the other party, they will not bar the right to a divorce (citing case) \* \* \*." Moreover, as noted earlier herein, the General Assembly in 1967 specifically withdrew the only theretofore existing legislative mandate requiring the doctrine's application, *i.e.* where both the grounds for divorce alleged in the complaint and the recriminatory conduct amounted to adultery, and the evidence established that both parties were guilty of adultery. Under these circumstances, we believe it appropriate for this Court to reexamine the doctrine. Upon such reexamination, we have, in accordance with what we have herein said, found its continued existence, as expressed in *Duberstein*, wanting.

■■ It should be expressly noted that what we have stated here

should not be deemed to constitute a judicial adoption of an additional ground for divorce in this State, *e.g.*, irreconcilable differences, which of course would be wholly improper as an encroachment upon the legislative domain. What we do say, however, is that courts no longer need slavishly or automatically apply the historic doctrine of recrimination in cases where such application would, in the exercise of sound judicial discretion, be unwarranted. With respect to the instant case, we believe the trial court did not err in exercising its discretion in favor of the dual decree of divorce.

■■■ Appellant further attacks the provisions of the order entered by the trial court granting each party permanent custody of two of the family's four children. In reaching its decision on this question, the trial court considered the wishes of the children involved, as well as the Juvenile Probation Officer's recommendations, who made same pursuant to agreement of the parties, and acted in accordance therewith. We do not believe it necessary to recite a detailed summary of the factors leading to the trial court's decision, and it will suffice to say that we can find nothing in the record establishing that the trial court's action in this regard constitutes an abuse of its discretion or is against the manifest weight of the evidence. Its decision will accordingly not be disturbed by this Court. *Peck v. Peck*, 16 Ill.2d 268, 279; *Windhorn v. Windhorn*, 131 Ill.App.2d 785, 264 N.E.2d 531, 534.

■■ The final contention with which we must deal is appellant's suggestion that the trial court acted incorrectly in directing him to pay appellee an amount representing one-half of his "credit-savings" held on his behalf by his employer. It appears that these "credit savings" may not be obtained by appellant unless he leaves his employment, retires, is absent from work because of illness, or is "laid-off" work. The order attacked thus does not require appellant to pay appellee this sum immediately, but rather causes a lien to be attached thereto in favor of appellee, and directs appellant's employer to pay appellee one-half of the amount held in the account at the time of the court's order at such time as it becomes payable. Under Section 18 of the Divorce Act, the court may order the payment of lump sums of money as settlement in lieu of alimony as may be equitable. These parties were married for some seventeen years, during which time most of appellant's "credit savings" in this account were amassed. Under such circumstances, we are unable to find the trial court's order inequitable or the result of an abuse of its discretion.

Appellant also presented other arguments, but our disposition of the case, renders it unnecessary to discuss them.

. Since we find no error in the determinations of the Circuit Court of Iroquois County, its judgment will be and hereby is affirmed.

Judgment affirmed.

STOUDER, P. J., and SCOTT, J., concur.