(No. 26834.—

VIOLET C. FISHER, Conservatrix, Appellee, *vs.* ANTHONY
K. BURGIEL *et al.*, Appellants.

*Opinion filed January 21, 1943.*

GODFREY, SAVIN & HOFFMAN, (CLYDE C. FISHER, of counsel,) for appellants.

FREDERICK C. JONAS, for appellee.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This suit was brought in the superior court of Cook county by the conservatrix of the estate of Nellie Hollingshead, an incompetent person, to set aside deeds to twelve pieces of real estate conveyed by Nellie Hollingshead to Irving Hoffman and which, as a part of the same transaction, he conveyed to Nellie Hollingshead and defendant Anthony K. Burgiel in joint tenancy. It included a request for an accounting of certain moneys and personal property alleged to have been given to the defendants, Anthony K. Burgiel and Mary Burgiel, husband and wife, by Nellie Hollingshead while she was mentally incompetent and while acting under the domination and influence of the defendants. The complaint charged that, at the time of the conveyances of the real estate and the giving of the personal property and moneys, Nellie Hollingshead was suffering from senile dementia, that she was incompetent and did not understand or comprehend the nature of her acts; that she was taken into the home of defendants pursuant to a conspiracy to obtain control and domination over her and her property and to defraud her of her estate. The complaint further charged that a confidential relationship existed between Nellie Hollingshead and the defendants; that no adequate consideration was given for the conveyances or the personal property; and that the conveyances and moneys were obtained by the defendants by the use of undue influence and duress. The answer denied the material allegations of the complaint and the defendants filed a jury demand which was stricken by the court.

The cause was referred to a master in chancery who heard voluminous evidence and made his report, finding

that at the time of the conveyances and transfers of money and property to the defendants, Nellie Hollingshead was mentally incompetent and unable to understand the nature of her acts; that a fiduciary relationship existed between the defendants and Nellie Hollingshead and that the defendants acquired complete domination and control over the financial and business affairs of Nellie Hollingshead and abused and violated their position of trust and confidence, enabling them to acquire her property and money without adequate consideration. The master recommended that the conveyances of real estate be set aside, found that defendants should be required to account for the sum of $1972.75, and recommended that judgment be entered for that amount. The report and recommendation was approved and a decree entered.

The evidence shows that Nellie Hollingshead was a retired school teacher and that at the time of the transactions in question she was about 77 years of age. It is admitted that she was a well-educated, intelligent woman, and that prior to 1936 she was fully able to transact business and to care for her own interests. There is evidence that when she was normal she was eccentric in her dress and personal habits, but it is clear that in those years she was alert mentally, shrewd in her business dealings, economical in her expenditures and used the utmost care in her personal living expenses. Allegations of the complaint are that the real estate in question was worth about $20,000 and that said ward owned other real estate and personal property of about the same value. She retired from school work about 1930. For a number of years she had been a sufferer of arthritis, arteriosclerosis and rheumatism. She lived in a house only one removed from the defendants and had known the defendant Mary Burgiel for about thirty-five years, having been her instructor in school. In August of 1938, Miss Hollingshead went to live in the home of the defendants and continued to live there until a conservator

was appointed. On March 11 and 23 of 1939, she executed the deeds involved in this case. From January, 1938, to August, 1939, she withdrew about $8600 from her bank accounts and the evidence shows that a large part of this money passed to the defendants. She was adjudged an incompetent person on August 16, 1939.

The evidence as to her mental competency during the years 1936, 1937, 1938 and 1939 is in conflict. Thirteen witnesses testified for the plaintiff as against twenty-two for the defendants. Most of these witnesses were neighbors, friends or business people who had good opportunities to observe her during the period in question. The testimony of plaintiff's witnesses is that a marked mental deterioration started about 1936; that they noticed she became forgetful, absent-minded, was dirty and unkempt in her house and personal habits, that she failed to recognize old friends and had hallucinations and delusions.

Dr. Stanley L. Brown, who had been her physician from 1910, testified that from 1936 she had a progressive senile dementia. He stated that one symptom of the disease was manifest in the degeneration of her attitude toward personal cleanliness, that in the years 1936-1939, inclusive, she became very dirty, ragged and unkempt and permitted her house to become filthy with the droppings of dogs, cats and birds that she kept as pets. This witness testified that from 1936 she frequently failed to recognize him, that her ailments were rendered more acute by her refusal to get the proper food and that her principal diet was bread and coffee. He stated she had delusions that someone was trying to rob her; that she lacked orientation to her surroundings as to time and place. In July, 1938, he took her to St. Margaret's hospital where she stayed for five days; that while she was in the hospital he saw her walking in the halls nude and that the hospital attendants complained to him of similar conduct at other times. The witness saw her again in the Burgiel home during the early

part of the year 1939 at which time she was in bed. He said her mental condition was progressive and that she was worse on that occasion than when he saw her in the hospital in 1938. In his opinion she did not have sufficient mental capacity to understand ordinary business transactions in 1938 or 1939.

Dr. Stanley J. Mintek, a psychiatrist of considerable experience, testified that he examined Nellie Hollingshead on July 24, 1939, and was present and testified in court on August 16, 1939, when she was adjudged an incompetent person and the conservatrix was appointed. The witness saw her at a sanitarium and made another examination. In his opinion she was of unsound mind when he first saw her July 24, 1939, and continued so to the date of the last visit, August 16, 1939. He testified that her mental condition as he found it was of long standing. He said she was suffering from senile dementia, the symptoms of which were forgetfulness, childishness, lack of orientation, untidiness, delusions and incoherence. He said it was progressive and incurable.

Dr. Carl A. Wilke testified he treated Nellie Hollingshead twice in June of 1938 and he diagnosed her case as of generalized arteriosclerosis, rheumatism, arthritis, general mental debility, senile dementia and general deterioration of mental and physical health. He stated that her mental condition was progressive and that there could be no rehabilitation at her age, and that in his opinion she was of unsound mind in June, 1938. He did not think there would be any change for the better after that date and that she would be mentally incompetent to transact any business or to transfer real estate in February or March of 1939.

Veresta E. Fisher, the mother-in-law of conservatrix, testified she had known Nellie Hollingshead as a close friend for thirty-five or forty years and during the last several years had seen her at least three or four times a week. In her opinion she was mentally unbalanced during the years

1936-1939, inclusive. The basis of her opinion was the filth and squalor under which she lived, keeping dogs, cats, chickens, pigeons in the house and permitting them to lie in the bed where she slept, eating out of the same dishes with her. She stated that if a pet should die she would hang the carcass on the wall or place it in a basket in her house. She testified to acts which would indicate delusions, that she did not know time of day or where she was; that she would talk of seeing and conversing with people she had known and who had been dead for several years.

Nine other witnesses, most of whom were neighbors of long acquaintance with a daily opportunity to observe Nellie Hollingshead, testified that she was unsound mentally from 1936. They related separate incidents in their own experience bearing on her sanity, but all testified to the filth and dirt in which she lived, giving a description of the home, the animals and poultry in it, much the same as that included in the testimony of Veresta E. Fisher and other witnesses whose evidence has been set forth. They described incidents where her memory was so bad that she would frequently forget she had already bought an article and would try to buy it a second time and that she would try to pay for the same article several times; that she would completely forget recent events; fail to recognize persons whom she had known for many years; that she frequently would not know where she was or where she had been and that she often spoke of people as living who had been dead for many years; that on one occasion while on a trip to St. Louis with one of the witnesses, she became unruly and contended that in all her teaching experience she had never seen a map with St. Louis on it, that during said trip she left the car and began removing her clothes preparatory to going to bed on the highway in midafternoon.

Dr. Anthony Zelazny testified for the defendants that he had examined Miss Hollingshead in the Burgiel home

on March 10, 1939, and found her suffering from hyper-thropic arthritis. He stated she was responsive to questions as to her physical condition and in his opinion was sane. When the doctor had finished his physical examination, the defendant, Mrs. Burgiel, asked him to give her a statement as to the sanity of Nellie Hollingshead, and the witness gave the defendant a statement that Miss Hollingshead was sane.

Dr. Frank H. Stevenson testified for the defendants, that he was called to the Burgiel home on July 21, 1939, to examine Nellie Hollingshead, to see if she was in physical condition to make a trip to Michigan. The doctor found she was suffering from rheumatism, was debilitated and seemed to be nervous and worried about something. He advised the Burgiels that she was not in condition to make the trip and testified that during his examination he had not discerned anything which would indicate that her mind was not sound.

Dr. Otis A. T. Bell, a dentist, testified that he did some dental work for her in September, 1938, and made about eight or ten visits to the Burgiel home to install a plate; that in his opinion she was of sound mind.

Dr. Robert F. Day treated Miss Hollingshead at the Burgiel home three times during August and September of 1938 and testified that she was afflicted with arthritis deformans, a type of deforming arthritis. In his opinion she was of sound mind during his visits.

Julius L. Kahn, a lawyer, testified that he drew a will for Nellie Hollingshead in July, 1939, and that at that time she was in possession of all her mental faculties as far as he could see. This witness also represented her on the hearing in the court for the appointment of the conservatrix.

Dr. Alex S. Hershfield, a Chicago neuropsychiatrist, testified that he examined her at his office on August 7, 1939, that she was accompanied by Mrs. Burgiel and attorney Kahn; that in his opinion she was sane at the time of

his examination and capable of conducting her own business affairs.

Mary Jabrosky, a retired teacher and close friend of Nellie Hollingshead for almost forty years, testified that she saw Miss Hollingshead at frequent intervals from 1936 to 1939 and that she was sane. The witness testified that she consulted Miss Hollingshead on business matters and regarded her advice sound; that she had frequently told her of the kindness of the Burgiels and that at times she urged the witness to move to the Burgiel's home and live there instead of going to an old people's home. The witness testified that while she was crippled with arthritis, her mind was sound and her business judgment good.

Charles J. Snyder testified that he was present in the Burgiel home when the deeds in question were signed; that she talked with him intelligently before signing the deeds and that he heard her explain to attorney Godfrey, who had drawn the deeds, that she wanted her property to go to Mr. Burgiel because the Burgiels had been kind to her and that she did not want her sister to get it because her sister had not shown much interest in her illness. The witness testified that she was of sound mind at the time the deeds were signed and that she identified each property conveyed as she signed the deeds.

Fifteen other lay witnesses, including the defendant Mary Burgiel, testified that Nellie Hollingshead was of sound mind during 1936-1939, and that she was mentally capable of transacting business during those years. It would serve no purpose to further lengthen this opinion by detailing their testimony. These witnesses were business people, neighbors, and friends who had a good opportunity to observe Nellie Hollingshead, and their testimony as to the facts and as to her mental competency directly contradicts that of the plaintiff's witnesses.

In view of the conclusion reached in reference to the charge that there was a confidential relationship and a

breach of the trust it will not be necessary to determine the weight of the evidence as to mental capacity, and the only purpose of relating the evidence on mental condition is to show the circumstances under which the confidential relationship existed.

The defendant Mary Burgiel had known Nellie Hollingshead as a friend for over thirty-five years and was a pupil of hers in the second or third grade. After the Burgiels were married in 1915, they resided in a house one door removed from Miss Hollingshead's home. Anthony Burgiel frequently did odd jobs for Miss Hollingshead in reference to painting and repairing her property. On December 28, 1936, the defendants entered into an agreement with her, which was in the handwriting of the defendant Mary Burgiel, and signed by all of the parties. It provided the defendants were to furnish Miss Hollingshead board and room the remainder of her life for $150 per month. During the year 1937 and until August of 1938, Nellie Hollingshead stayed with the Burgiels only intermittently. She did not give up her own home and stayed there part of the time. She was, however, charged for room and board at $150 per month for seven months in 1937 and for the entire year of 1938. At the time Miss Hollingshead moved into the defendants' home in August of 1938, she had substantial savings and checking accounts with the Northern Trust Company and the First National Bank of Chicago. From January 3, 1938, to August 16, 1939, approximately $8600 was withdrawn from these bank accounts. Most of the withdrawals were by checks written in Mrs. Burgiel's handwriting and signed by Nellie Hollingshead. Miss Hollingshead had a savings account in the Northern Trust Company with a balance in January, 1939, of $1939.16. On March 31, 1939, she withdrew by mail $1300 from this account and received a cashier's draft for that amount; this was endorsed to the defendant, Anthony Burgiel. On June 5, 1939, another draft was drawn

against her account for $235, which apparently went to the Burgiels, and on August 8, 1939, a week before Nellie Hollingshead was adjudged an incompetent person, she requested the bank by mail to send two drafts, one payable to Mary Burgiel for $300 and one to Julius Kahn for $100. This left a balance in the account of $7.19. She had both a checking and savings account in the First National Bank of Chicago. The savings account, amounting to $1802, was transferred to the checking account and between the dates of January 3, 1938, and August 16, 1939, checks totaling $6711.01 were issued, leaving a balance on August 16, 1939, of $183.64. Some of the orders to transfer funds and checks were in Mrs. Burgiel's handwriting, except as to the signatures. The evidence shows that a substantial part of the $6711.01 withdrawn from the First National Bank of Chicago went to the Burgiels.

In explanation of these transactions defendant Mary Burgiel testified that, from about 1930, Nellie Hollingshead had frequently asked her if she could live with them and that the written contract of December 28, 1936, was Miss Hollingshead's own idea. Mrs. Burgiel related that prior to 1937 she had conducted a canary-breeding business, a rug-weaving business and a nursery business and that her net earnings were about $3000 a year. She stated that she had cared for both Miss Hollingshead and her mother during illnesses in the past and that when the contract was made Miss Hollingshead insisted that Mrs. Burgiel should care for her personally, and promised Mrs. Burgiel that if she would give up her business and devote her time to taking care of and being a companion to her, she, Nellie Hollingshead, would compensate the Burgiels by conveying property to them of the value of $25,000 and to secure the transfer she would execute a note payable to defendants for that amount. She testified that Nellie Hollingshead signed such a note and that the transfer of the twelve pieces of real estate in March, 1939, was in accordance

with such agreement. The note was not introduced in evidence. The explanation of the withdrawals, which substantially depleted the bank accounts, is somewhat obscure. The witness admitted that they received approximately $2000 for board and room. The $1300 given to the defendant Anthony Burgiel, on March 31, 1939, is stated to have been applied as follows: $800 on account of work performed by him on the Hollingshead properties and $500 as a gift to him. Other moneys withdrawn were stated to have been gifts to members of the Burgiel family, payment of her doctor and lawyer bills, expenses, taxes and repairs on her property. Testimony of certain tradespeople substantiates the claim that Mrs. Burgiel exercised control over Miss Hollingshead's business and financial affairs.

The evidence shows that during the period covered in the transfer of the real estate and personal property Miss Hollingshead reposed complete trust and confidence in the defendants and that they exercised domination and control over her and her financial and business affairs. In view of the evidence of all the witnesses who knew her when normal, that she was guarded in her expenditures amounting to a deprivation of the necessities of life, her lavish expenditures and depletion of bank accounts while with the Burgiels can not be accounted for on any theory except that the defendants influenced her into the making of a contract for exorbitant monthly payment for care and board, substantial gifts to them and other payments for which small, if any, consideration was returned. The evidence clearly establishes the existence of a fiduciary relationship between the defendants and Nellie Hollingshead from December, 1936, to the time she was adjudged to be an incompetent person on August 16, 1939.

It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring. The fiduciary relationship with its legal incidents includes not only all legal and tech-

nical relations such as guardian and ward, attorney and client, principal and agent and the like, but it extends to every possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side and resulting domination and influence on the other. (*Beach* v. *Wilton,* 244 Ill. 413; *Kosakowski* v. *Bagdon,* 369 id. 252.) The relationship need not be legal but it may be either moral, social, domestic, or merely personal. *Seeley* v. *Rowe,* 370 Ill. 336; *Mors* v. *Peterson,* 261 id. 532; *Roby* v. *Colehour,* 135 id. 300; *Feeney* v. *Runyan,* 316 id. 246.

When the relationship is established, the burden is on the one profiting by the transfer of property to show that it was procured fairly and without the exercise of undue influence. If such relationship existed at the time of the transfers, then the transactions are deemed to be presumptively fraudulent and will be set aside, unless the one in whom the confidence and trust was reposed establishes their fairness by clear and convincing proof. (*Children's Home of Rockford* v. *Andress,* 380 Ill. 452; *Seeley* v. *Rowe, supra; Mors* v. *Peterson, supra; Thomas* v. *Whitney,* 186 Ill. 225; 2 Pomeroy's Equity Jurisprudence, (3d) sec. 956.) The burden was on the defendants to establish by clear and convincing proof the fairness of all transactions or transfers made to them by Nellie Hollingshead.

The evidence as to the existence of a confidential relationship is clear, and defendants have not sustained the burden of showing that the conveyances and transfers were fairly obtained or that Miss Hollingshead acted of her own volition or on independent advice. Unless such a showing were made, the presumption from the evidence would be that she was grossly overreached. It is the province of the master in the first instance to pass upon the creditability of the witnesses. While his findings do not carry the same weight as the verdict of a jury, nor of a chancellor where the witnesses have testified before him, yet the master's

findings are entitled to due weight on review of the cause. (*Keuper* v. *Heirs of Mette,* 239 Ill. 586.) His conclusions as to the facts have been approved by the chancellor. In that situation we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. *Mruk* v. *Mruk,* 379 Ill. 394; *Pasedach* v. *Auw,* 364 id. 491; *Klekamp* v. *Klekamp,* 275 id. 98.

The defendants complain that they were denied a fair hearing. The substance of this complaint is that evidence was improperly admitted and that evidence offered by defendants was erroneously rejected. It is claimed the record shows the master was so prejudiced that he could not properly weigh the evidence. We have examined the record for these alleged errors but find nothing that would warrant a reversal of the decree. The chief complaint against the fairness of the master arises more from insinuating remarks he permitted counsel for plaintiff to make, which we do not approve, but on the whole record the master gave defendants a fair hearing.

The defendants further contend that the chancellor committed reversible error in striking their jury demand. Section 63 of the Civil Practice Act (Ill. Rev. Stat. 1941, chap. 110, par. 187,) expressly vests in courts of equity discretion as to whether they shall call a jury on questions of fact in chancery cases. Trial by jury in such cases does not exist as a matter of right, except in certain enumerated cases, notably contests of wills. The rule in this State is that it is discretionary with the chancellor to require the issue of fact arising in equity cases to be tried by a jury, and a jury trial is never a matter of right in a chancery case unless expressly made so by statute. (*Keith* v. *Henkleman,* 173 Ill. 137; *Brown* v. *Miner,* 128 id. 148; *Phillips* v. *Edsall,* 127 id. 535; *Dowden* v. *Wilson,* 71 id. 485.) The verdict of the jury in chancery cases where a jury trial is allowed at the discretion of the chancellor is merely advisory and is not binding upon the chancellor.

(*Guild* v. *Hull*, 127 Ill. 523; *Maynard* v. *Richards*, 166 id. 466.) The right to a trial by jury which is guaranteed by the constitution applies only to actions known to the common law and is not a matter of right in equity proceedings. (*Weininger* v. *Metropolitan Fire Ins. Co.* 359 Ill. 584.) The chancellor committed no reversible error in striking the defendants' jury demand.

The plaintiff does not assign error as to the amount of the money judgment entered against the defendants, and we hold that the amount of the money judgment against the defendants is amply sustained by the evidence.

The decree of the superior court was correct and is affirmed.

*Decree affirmed.*