(No. 26941.—
Alex Zarembski, Appellee, *vs.* John Zarembski *et al.,*
Appellants.

*Opinion filed March 16, 1943—Rehearing denied May 14, 1943.*

S. X. Blaszczenski, and John J. Maciejewski, (G. A.
Buresh, of counsel,) for appellants.

CZEKALA & FRIEDMAN, (LOUIS DAVID FRIEDMAN, and ARNOLD D. McMAHON, of counsel,) for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

In this case a complaint in chancery was filed by the appellee, Alex Zarembski, on November 27, 1940, in the circuit court of Cook county, to set aside and cancel a deed executed by him on April 25, 1932, conveying to his son certain real estate located at 3317 North Hamlin avenue, Chicago. After answer was filed the cause was referred to a master in chancery on the sole question of the right to have the deed of conveyance set aside. Proofs were taken and the master recommended a decree as prayed for in the complaint. After exceptions to the report of the master were overruled, the court entered a decree setting aside and cancelling the deed. The facts are in direct conflict and it is therefore necessary to recite them at length.

On April 25, 1932, and for many years prior thereto, the appellee was the owner of premises located at 3317 North Hamlin avenue, Chicago, consisting of a lot and dwelling house subject to a mortgage of $1700. It appears from the evidence that the wife of appellee, with whom he was a joint tenant upon the premises occupied by him, died on March 28, 1932. The building upon the premises was a three-flat building and during the early part of April, 1932, the first floor was occupied by a party named Kosnik. One flat was occupied by the appellee, a single daughter, Eugenia Zarembski, and appellant John Zarembski. The other flat was occupied by one of the married daughters, Bernice Marofka, and her husband. The appellee at said time was about sixty-six years old, had not been working since February and received a pension in the amount of $27.30 per month from the Illinois Steel Company. He cannot understand, read, write or speak the English language, but can speak and understand the Polish language,

can read a little in Polish and subscribes his name with a cross. At this time John Zarembski was about thirty-seven years of age, speaks and understands Polish and reads, writes, speaks and understands English. Eugenia Zarembski was single and unmarried.

Bernice Marofka and Marie Chmielewski, the two married daughters of the appellee, and their respective husbands, Joseph Marofka and Bruno Chmielewski, together with Eugenia Zarembski, the other daughter, and the appellee testified for him concerning a meeting, which occurred about two weeks after the death of his wife, in the flat occupied by him in the premises with John and Eugenia Zarembski. This conference took place about April 10, 1932. The conference was called together by the appellee who opened the conversation and told his children that he wanted to make a "testament" (Polish word for will); that he was getting old, was unable to take care of his property any longer, wanted to give to each of his daughters the sum of $1000 payable after his death, his real estate to go to his son, John Zarembski, the $1000 to each of the children to be paid by John Zarembski after the appellee's death. John said that $1000 to each of the daughters was too much. The appellee then said that if that was too much then Marie Chmielewski and Bernice Marofka should get $500 each and Eugenia Zarembski $1000 and the remainder of the property go to John Zarembski after his death; that John Zarembski was to take care of the property, but the appellee wanted to be the owner as long as he lived and wanted to live in the building during the rest of his life, John to furnish to the appellee food, clothing, support and to take care of his funeral bill and his doctor. This was agreed to by all of the parties present, according to said witnesses. The appellee then suggested that they go to a lawyer and thereafter both John and he went to attorney Casimir Cherpeck. The appellee testified that he wanted to take his two daughters with him but John

said, "No, the two of us will take care of everything." According to the appellee there was no one else present at the attorney's office except himself and John; that he opened the conversation with the lawyer and told him he wanted to make a testament; that he talked to the lawyer in Polish; that thereupon the attorney sat down to write, asking the appellee his name and address; that he then told the lawyer what he wanted to leave and gave the names and addresses of Mrs. Chmielewski, Mrs. Marofka and Eugenia Zarembski to the lawyer and the respective amounts they were to get; that he was only at the lawyer's office once; that no one at that time used a typewriter, but that the lawyer wrote in longhand on paper; that he was taken into the hallway and a man with a long beard came along and placed a paper on a window and took the appellee's hand, wrote on the paper and left the paper on the window; that this man ran away and the attorney took the paper and went back into his office where John was sitting and waiting; that John spoke to the attorney in English during the conference, the appellee being unable to understand anything that was said; that the lawyer read the document to him before he signed it, but read it in English and did not explain to him what it was, nor did the appellee ask him what it was; that after writing down the information, the attorney said to the appellee "good testament;" that appellee asked him for the papers, but Cherpeck told him it was unnecessary; that he told the lawyer he wanted to occupy a flat of four rooms in the building for the rest of his natural life; that the lawyer did not talk to him, but admitted that certain questions were asked and that he asked the lawyer how much he owed and the lawyer said $30, which he paid without receiving a receipt.

There was a mortgage of $1700 on the property at the time, but according to the appellee nothing was said at the first conference about what was to happen to the mortgage.

The taxes on the property were paid up to date. On the way home from the lawyer's office he asked John if everything was all right. John said it was. When he got home, appellee said he told Eugenia he was glad he had made a will. The appellee's daughters and their husbands testified they heard their father many times after the conference at the attorney's office exclaim he was glad he made a will and that the property was his until he died. Appellee further testified that after 1932, he paid for his food and clothing out of his pension money, which was sufficient for the purpose, and did not ask his son for anything and that they did not give him anything.

The plaintiff, his son John, and his daughter Eugenia lived together in the apartment until Eugenia's marriage in 1935, when she left the apartment. In 1936 John and Mary Zarembski were married. Up to that time appellee said everything was in order and that he and John got along very well, but after she came there to live she started trouble between John and himself, called him names and wrangled with him. But for this he said he would not have filed this cause of action, and because of abusing him, he started this suit. Prior to John's marriage, the mortgage of $1700 was paid off—$700 thereof being advanced by the appellee and $1000 being advanced by John.

Beginning August, 1940, appellee testified to mistreatment on the part of John and his wife on several different occasions. He was corroborated in a measure by a witness, Mrs. Wolnik, a tenant living upstairs. On cross-examination, however, appellee admitted that his son John never struck him but wrangled with him because of his wife. He testified that after the trouble began in August, 1940, he was taken by one of his daughters to attorney Czekala; that for the first time he found that he had not signed a "testament," but had signed a warranty deed to John. Thereafter the daughters, except Eugenia, and their husbands called at the home of the appellants where the ap-

pellee was living and held another conference with appellants and the father. This conference resulted in a very serious family quarrel and greatly aggravated the unfriendly relations then existing between the father and John and his wife. Shortly after this John caused the apartment above to be vacated and moved into it, moving out much of the furniture. Since that time the appellee has been living separate and apart from the appellants.

Eugenia testified that she found three notes, one to each of her sisters for $500 and one for herself in the amount of $1000, in the dresser drawer in 1937. This dresser she said was everybody's dresser—that all used it; that nobody gave her the note; that she took it herself and she delivered the other notes to her sisters; that John had paid her the full amount of her note; that she had gotten married on May 11, 1935, and had moved out right after her marriage; that she visited her father quite often after her marriage and that he was treated very nice by John until he got married; that John was good to her father, but that it was the wife who did not treat him very well and that she was a witness in the case against her brother because she did not like his wife.

The defendant Mary Zarembski was a sister of Bruno Chmielewski and her marriage to John was her third marriage. Because of this, Bruno testified he did not like her. Marie Chmielewski testified she did not like Mary Zarembski. Bernice Marofka testified she was not speaking to her brother, John Zarembski. Joseph Marofka testified he did not know whether his father-in-law was being mistreated by John or not, but admitted striking John, upon the altercation which took place at the second family conference.

The appellant John Zarembski testified that the father called the original conference together saying he was getting old and had a building to take care of which would be too much for him, with the mortgage due in two years

and two-years' back taxes to pay; that his father said he wanted to give the building to John and would give each of his daughters $1000; that there was $1700 against the property on the mortgage and that repairs had to be made to the basement flat, the house had to be painted and the garage and shed fixed; that John said, "That will count up to about $6000, that is too much." Then the father suggested giving Marie and Bernice $500 each and Eugenia $1000, payment to be made six months after his death without interest, also saying that he had insurance in the sum of $1000 to take care of the funeral expenses. All of the children agreed to this final proposal. The daughters suggested going to a lawyer, Marie suggesting Cherpeck. John asked the daughters to go along but they said "You do that and papa will be perfectly satisfied," whereupon John and his father went to Cherpeck's office. The father there talked to Cherpeck in Polish and told him he wanted some papers prepared; that he had a building he wanted to give to John and wanted to give Marie Chmielewski and Bernice Marofka each $500 and Eugenia Zarembski $1000. Cherpeck wrote while his father talked to him. The appellee then requested one of the flats in the premises for the rest of his days and told Cherpeck he wanted three notes to be made out, payable six months after his death without interest. After Cherpeck had finished writing the information, he told them that the papers would be ready within a few days. A few days later John and his father again called at Cherpeck's office and Cherpeck in Polish told the appellee all of the papers were ready for signature; that the attorney read all of the papers to his father word by word and explained it to him word by word in Polish. When he was through the father said, "Everything is all right." When the papers were handed to the father to sign, the father told the attorney that he could only sign by means of a cross, whereupon Cherpeck said he had to have a witness. Cherpeck went out and got a witness to

the appellee's signature. This witness did not have a beard. After the execution of the documents, Cherpeck told witness's father to come back in five, eight or ten days and that the papers would be ready for him to take home; that he, John, went back the third time by himself and got the papers. At the second visit the attorney gave appellee the three notes, together with a receipt for $35 for his services. The father gave the receipt to his son for safekeeping. John gave his father $10 which the lawyer explained was to make the deed legal.

John further testified that on April 10, 1934, the mortgage came due. Before the due date John discussed it with his father alone. The father told him he had $700 which he would lend John and John should pay the rest and that John could pay the $700 back to him in the form of doctor bills or for medicine and things like that. Thereupon John paid off the mortgage to the Cosmopolitan Bond and Mortgage. The latter part of July, 1935, the father's group-insurance policy was discontinued, whereupon the defendant, John, went to the Illinois Steel Company with his father and applied for new insurance in the American National Insurance Company. John paid the premiums after his father told him he could pay the premiums out of the $700 borrowed from him. After the $700 was used up John was to pay the balance out of his own money. From 1932 on John paid the taxes, including two years in arrears, collected the rents, made the repairs, paid the water bills and paid for all material and labor relative to the repairs and managed the property. In addition thereto he paid to Eugenia the sum of $1000 upon her note and received the note in return in 1938. John testified he treated his father good, but that after he married, his father did not treat his wife very well, that his father quarreled with her and often called her a "whore" in Polish and accused her of coming into his estate when she was not supposed to.

In September, 1940, John and his wife conveyed the property to one Borowski who reconveyed to the appellants in joint tenancy. John denied that the father ever said that John was to take care of, clothe and feed him, saying however that the father had said that he had enough money of his own and that the pension would take care of his food and clothing; that he testified he found out the house was his when he got the papers and looked at them on the third visit to the attorney. After that he told the father the house was his, which took place the first time after he paid off the mortgage in 1934. A little misunderstanding took place at this time, at which time he told his father he did not want his house and that he should go over to a lawyer and the appellant, John, would sign the paper right back to him, because he was having too much trouble with him going out and getting drunk. John and his wife both testified that the father drank heavily and would frequently come home in an intoxicated condition, which always created trouble.

Cherpeck, the lawyer, testified from his records, consisting of a diary and a file. He saw the father and John Zarembski for the first time April 21, 1932, not having ever seen them before. He had no independent recollection as to just what was to be done, but had a notation that there was to be a deed made out in which the grantor reserved the right to live in the property for his natural life, also the name of the grantor and grantee and the fact that there were to be three notes—two for $500 each and one for $1000—showing the names of the appellee's three daughters, these notes to be payable six months after the father's decease, without interest. Apparently they gave him information with reference to a mortgage at the Cosmopolitan Bank and also information as to two insurance policies, part of one of which was on the garage. There were notations for assignments of these policies. He did

not prepare any papers on that day. His diary showed the next appointment to be April 25, 1932, about a forcible detainer and a note to have the appellee go to the bank for the mortgage or the policy. The papers were executed on that day and $35 was paid on account of fee and recording of deeds and assignment to Cosmopolitan Bond and Mortgage personally by the father and for arrangement on a guarantee policy. He identified the documents prepared by him and said that the deed was prepared April 25, 1932, and signed by the appellee in his presence. He knew this because he would not otherwise so acknowledge it; that he called in Dr. Leonard Luzyski as a witness. The doctor officed in room 202, whereas the witness officed in room 205. The doctor never wore a beard and there was never anyone present on April 21 or April 25 who wore a beard. Besides a deed, attorney Cherpeck prepared an affidavit which was signed by the appellee. He had no independent recollection that there was any conversation relative to a will but if any request was made to draw a will, his files or his diary would so disclose; that he did not draw a will and did not think that he was at any time asked to prepare a will.

The appellants produced several witnesses who were near neighbors and friends of the family who testified that John and his wife treated the father kindly and that trouble only arose when the father came home in an intoxicated condition.

In the complaint the appellee offered to pay the appellants for any amount that might be due them because of the cancellation of the deed, upon a full accounting being had between the parties. In the answer filed by the appellants it was stated: "Defendants say that to insure amicable and friendly relationship between defendants and plaintiff and the immediate family, defendants are willing, ready and able to reconvey title to plaintiff, provided a full, com-

plete and just payment is made to them for their work, labor and services performed, and for moneys expended in and about said premises."

On the reference, the master found the facts as testified to by the appellee and his witnesses, and the decree of the court approved the master's report and set out the facts in detail. The decree ordered the deeds herein mentioned be set aside and declared to be null and void, and the cause stand referred to a master for the purpose of taking proofs and reporting his conclusions for an accounting between the parties.

As stated above, the evidence is conflicting. The master in chancery saw the witnesses and heard them testify. There is sufficient testimony in the record to sustain his finding that when the appellee, on April 25, 1932, executed the warranty deed in question he thought he was making a will or "testament." Also that at the first family conference, prior to the making of the deed, John Zarembski promised his father a certain measure of support and care during his lifetime. While the finding of facts by a master does not carry the weight of that of a jury, nor of a chancellor where the witnesses have testified before him, yet the master's findings are entitled to due weight on review of the cause. (*Keuper* v. *Heirs of Mette,* 239 Ill. 586; *Mruk* v. *Mruk,* 379 id. 394.) His report has been approved by the chancellor and we would not be justified in disturbing such findings unless they are manifestly against the weight of the evidence. *Mruk* v. *Mruk, supra.*

The appellants have devoted much of the space in their brief in contending that the master's findings are inconsistent, but if, on the whole of the evidence, the two facts noted above are properly proved, it is sufficient upon which to base a decree setting aside the deeds. Where a party, unable to read or speak the English language, was induced to believe that the instrument he signed and acknowledged was a will and not a deed, the deed should, on such proof,

be cancelled and set aside. (*Schaper* v. *Schaper*, 84 Ill. 603.) Where a parent has conveyed his real estate to a child on the child's promise to support and look after the parent during his lifetime, and, after the child has received the property, he repudiates or fails to keep his promise, a court of equity will aid the parent by setting aside the conveyance and restoring the property to the parent. (*McClelland* v. *McClelland*, 176 Ill. 83; *Cumby* v. *Cumby*, 240 id. 235; *Mruk* v. *Mruk, supra.*) Partial compliance will not be sufficient. (*O'Ferrall* v. *O'Ferrall*, 276 Ill. 132.) The agreement to support contemplates more than mere physical necessaries, it includes kindness, personal care and attention. *Mruk* v. *Mruk, supra.*

It appears to us from the record in this case that both the father, Alex Zarembski, and the son, John Zarembski, have equities in the property in controversy which should be carefully guarded and protected in the decree. The son had always lived at home and did not marry until he was about 41 years of age. The father depended upon John to carry on the place and everything was pleasant between them until the son was married. The new wife was not welcome in the family and the troubles and disagreements began. However, it was understood by all members of the family that the property should eventually go to John. After 1932 he paid out large sums of money in the management and maintenance of the home. He made improvements and paid the taxes. In 1934, when the mortgage became due, he cashed his soldier's bonus for $1000 and applied it on the payment of said incumbrance. He paid out $658.29 in premiums upon his father's life insurance. He paid $1000 in cash to his sister Eugenia in payment of the note and the amount her father desired her to have out of his estate, and became liable on two notes of $500, payable to each of his other sisters. All of these payments and obligations were in compliance with the understanding reached at the first family conference in 1932. As above

indicated in his answer, John offered to reconvey if he was properly reimbursed. We hold that the decree in this case should not be entered until an accounting is had between the parties and the amount due John Zarembski definitely fixed and ascertained; including the surrender to John of the two notes of $500 each outstanding and in the possession of the other two daughters, who should be made additional parties to the suit if that is necessary. That a decree should then be entered cancelling and setting aside the disputed deeds and providing that the amount due John Zarembski be made a judgment and first and prior lien against the real estate described in said deeds.

The decree of the circuit court is therefore affirmed in part and reversed in part, and the cause remanded for further proceedings consistent with the views expressed in this opinion.

*Affirmed in part, and reversed in part
and remanded, with directions.*