'(No. 29748.—

MARY M. PFAFF, Appellant, *vs.* LEX PETRIE *et al.*,
Appellees.

*Opinion filed January 22, 1947.*

Ben A. Stewart, of Rock Island, for appellant.

Murphy & Murphy, (Myron Murphy, of counsel,) both of Rock Island, for appellees.

Mr. Justice Wilson delivered the opinion of the court:

The plaintiff, Mary M. Pfaff, filed her complaint in the circuit court of Rock Island county seeking the cancellation of a quitclaim deed executed by her on January 14, 1944, in favor of the defendants, Lex Petrie and Madge Petrie, his wife. The master in chancery to whom the cause was referred recommended that the deed be set aside. The chancellor sustained defendants' exceptions, and entered a decree dismissing the complaint for the want of equity. Plaintiff prosecutes this appeal.

On January 14, 1944, and for a number of years prior thereto, Mary M. Pfaff was the owner in fee simple of a parcel of real estate improved with a six-room, two-story, stucco dwelling, a barn and several sheds, in the city of

Rock Island. Plaintiff was then a widow, seventy-four years of age, not strong physically, and somewhat lame as the result of a stroke suffered a few years earlier. Totally blind in her left eye, plaintiff possessed such limited vision in her right eye as to necessitate the use of a magnifying glass to enable her to read. Beyond the bare legal title, plaintiff had nothing more than a small equity in the property. Sometime earlier, defaults on a mortgage indebtedness had resulted in foreclosure proceedings being instituted. Pursuant to a decree of foreclosure, the property was sold at a master's sale on December 28, 1943, to Alex Handelman and Louis Wiesman for $5800, and a certificate of purchase issued to them. In addition, the property was subject to unpaid taxes for the years 1938 to 1943, totaling $620.89, and to three judgments, two entered in 1938, and the third in 1941, aggregating $1891.73.

Plaintiff and Madge Petrie first met early in 1938. Plaintiff and Lex Petrie did not meet until November, 1939. Both before and after the death of plaintiff's husband, in May, 1938, Madge Petrie called on plaintiff at her home in the capacity of a prospective purchaser. Because defendants were not interested in buying at plaintiff's then asking price of $10,000, their dealings did not, at that time, proceed beyond the stage of preliminary inquiries. The meetings did result, however, in a friendship between the two women and thereafter they visited each other at intervals of irregular frequency.

During the winter of 1939-1940, plaintiff's property was again the subject of negotiations between the parties. Madge Petrie's brother, Joseph McGinnis, an attorney, participated in some of the conferences. A plan was advanced whereby plaintiff and defendants were to become the owners of the property in joint tenancy; the defendants to pay $4000 and have the use and occupancy of the house, while plaintiff was to satisfy the mortgage debt, which was in excess of $3000, pay all back taxes, and to have the barn

on the rear of the lot remodeled into a three-room dwelling for herself at her own expense. Other than the foregoing, all the testimony relating to the transaction is in hopeless conflict. Each side charged the other with initiating the proposal. Plaintiff testified that defendants attempted to force the plan upon her and that she refused to go through with it. Lex Petrie testified that he refused to go through with the deal when he learned of the judgments outstanding against the property.

Immediately after the master's sale on December 28, 1943, Albert Dockterman, a real-estate broker, called on plaintiff and offered $1000 for her right of redemption. His testimony does not disclose whether the offer was made with knowledge of the existing judgment liens. The realtor was closely followed by defendants. As the result of several meetings in the early part of January, 1944, the parties concluded an oral agreement leading up to the execution of the disputed quitclaim deed. According to the testimony of plaintiff, defendants engaged to redeem from the master's sale, to satisfy all other liens and charges against the property, and to support her for the rest of her life, the consideration moving to the defendants being the right to move into the premises and live there with her, and a conveyance of the property, subject to a life estate in plaintiff. Defendants' version of the oral agreement differs in two material respects. They testified, first, that they only promised to furnish plaintiff with food and a room until the expiration of the fifteen-months' period of redemption and, secondly, that they were to receive a quitclaim deed. Pursuant to defendants' view of the contract, Madge Petrie appeared at plaintiff's home on January 14, 1943, accompanied by Fred Hauerwas, a notary public. Plaintiff then executed the deed and it was duly notarized.

Toward the end of January 1944, defendants, together with their thirteen-year-old daughter and all their household furnishings, moved in with the plaintiff. The parties

have since resided together. During the year, defendants bought up all existing judgments against the plaintiff, paying therefor the sum of $1570. Defendants paid back taxes of $620.89, and expended roughly $300 for repairs and minor improvements, exclusive of six hundred hours Lex Petrie testified that he spent in cleaning up the house and yard. Living together, the parties did not get along well and a series of quarrels ensued. Because of the strained relations, plaintiff spent much of her time at the home of a friend and neighbor, Mrs. Laura Schmid. In August, 1944, plaintiff ceased to take her meals with defendants. Thereafter, she spent her entire day with Mrs. Schmid, ate with her, paid a proportionate share of the cost of the meals and returned home at hours varying between seven o'clock in the evening and midnight.

In December, 1944, defendants sought to borrow $6000 secured by a mortgage on the premises so that they could redeem from the master's sale. The loan had progressed to the stage where the mortgage had been executed and recorded when plaintiff refused to sign a disclaimer required by the prospective mortgagee and the loan fell through. The twelve-months' redemption period expired on December 28, 1944, the property remaining unredeemed. Subsequently, defendants entered into a contract with Alex Handelman and Louis Wiesman to acquire the master's certificate of purchase for $6500. This agreement was nullified, however, when Marie E. Kaufman obtained judgment by confession against plaintiff for $518.21, and redeemed from the master's sale by paying $6235 on March 28, 1945, the last day on which creditors could redeem. May 17, 1945, this action was instituted. At the execution sale on June 18, 1945, defendants bid in the property for $9900, and received a certificate of purchase from the sheriff. This, they assigned as security for sums advanced by Alex Handelman and Louis Wiesman with whom they have a land contract for a deed to the premises. After all

proper distributions, there remained in the hands of the sheriff a surplus of $2943.29. Within the space of a few days, plaintiff assigned all her interest in these funds to her counsel as security for legal fees and the sheriff filed an interpleader herein. The surplus was then turned over to the clerk of the court to await the outcome of this litigation.

By her complaint, plaintiff seeks cancellation of the deed on the two principal grounds of fraud in the execution and undue influence resulting from a relationship of trust and confidence. Plaintiff alleges that she signed a paper on January 14, 1944, which she was unable to read because of her infirmities, upon the strength of defendants' representations that it was the oral contract reduced to writing, and that she did not discover until a later date that the purported contract was actually a quitclaim deed. The determinative findings made by the master were that (1) no fiduciary relationship existed between the parties; (2) defendants did not obtain the deed by fraud, duress or undue influence; (3) plaintiff was mentally incompetent at the time of the execution of .the deed; (4) there was no meeting of the minds as to the terms of the oral contract of which the deed constituted only a part, and (5) there was such a failure on the part of defendants to furnish meals and to redeem the premises as to require a court of equity to set aside the conveyance. The master recommended that the deed be cancelled and that an accounting be taken. Plaintiff did not amend her complaint. Neither did she make objections nor file exceptions to the master's report. Defendants interposed exceptions to the master's last three findings. The chancellor adopted the findings of the master that no fiduciary relationship was proved, and no fraud in the execution shown, and overruled the findings with respect to plaintiff's mental competency, mutual mistake and defendants' breach of contract. The chancellor expressed the opinion that the three

issues last stated were not properly presented by the pleadings but held that, in any event, the findings were against the weight of the evidence. A decree was entered dismissing plaintiff's complaint, and directing the clerk of the court to distribute to defendants the surplus moneys arising from the sheriff's sale. In view of the fact that the broadly drawn complaint contains certain allegations relating to mental weakness, mutual mistake and breach of contract and since both the master and the chancellor ruled on the merits of all five of plaintiff's theories of the case, we proceed on the assumption that these issues are properly raised by the complaint.

Plaintiff has assigned, in general terms, a number of errors, but all of them may well be enclosed in the single contention that the decree is contrary to the law and the evidence. Where, as here, the cause is referred to a master, all the facts are open for consideration, in the first instance, by the chancellor and, in the event of an appeal, by the reviewing court. (*Kosakowski* v. *Bagdon,* 369 Ill. 252; *Thatcher* v. *Kramer,* 347 Ill. 601.) Thus, the ultimate and final question in this court is whether the decree rendered by the chancellor was proper under the law and the evidence. *Chechik* v. *Koletsky,* 311 Ill. 433.

First, plaintiff contends that a fiduciary relationship existed between the parties and that, reposing trust and confidence in defendants, she executed the quitclaim deed, relying on Madge Petrie's false representation that it was merely the oral contract reduced to writing. A fiduciary relation exists in all cases in which a confidential relationship has been acquired. The origin of the confidence is immaterial. It may be moral, social, domestic or purely personal. If the confidence is in fact reposed by one party and accepted by the other, the relation is fiduciary. (*Fisher* v. *Burgiel,* 382 Ill. 42; *Kosakowski* v. *Bagdon,* 369 Ill. 252; *Swiney* v. *Womack,* 343 Ill. 278.) Courts of equity have carefully refrained from defining the particular in-

stances of fiduciary relations in such manner that other and perhaps new cases might be excluded. *Kosakowski* v. *Bagdon,* 369 Ill. 252; *Addis* v. *Grange,* 358 Ill. 127.

Broad though the limits of a fiduciary relation may be, nonetheless there are limits where, as here, the evidence adduced at the trial wholly fails to establish a fiduciary relationship. A fiduciary relationship must be based on something more than the fact that the parties are neighbors and that a friendship exists between them. There is no evidence of previous business dealings between the parties, no evidence that plaintiff sought or received defendants' advice in her business affairs, no appreciable evidence of mental weakness or an unconscionable contract—in fact, no evidence that the plaintiff reposed trust and confidence in the defendants. Plaintiff and Madge Petrie were drawn together by a mutual interest in a sale of the premises. Though a friendship ensued, Madge Petrie always remained a prospective buyer. Lex Petrie's meetings with plaintiff were largely concerned with the possible acquisition of the property. As prospective buyer and seller, the parties stood on opposite sides, each seeking to further his own best interests. It is obvious that the continuing relation of buyer and seller lends no credence to plaintiff's contention relative to the existence of a fiduciary relationship. When a relationship of trust and confidence is established, the burden is on the grantee to show that the agreement is eminently fair and was procured without the exercise of undue influence. (*Staufenbiel* v. *Staufenbiel,* 388 Ill. 511.) On the other hand, the initial burden of proof is on the party seeking relief to show the existence of a fiduciary relationship. (*Stewart* v. *Sunagel,* 394 Ill. 209; *McGlaughlin* v. *Pickerel,* 381 Ill. 574.) This, plaintiff has failed to do. Both the master and the chancellor found against plaintiff on this issue. Under such circumstances, we are not justified in disturbing that finding, unless it is manifestly against the weight of the evidence. *Zarembski*

v. *Zarembski,* 382 Ill. 622; *Douglas Lumber Co.* v. *Chicago Home for Incurables,* 380 Ill. 87; *Mruk* v. *Mruk,* 379 Ill. 394.

As a second ground for reversal plaintiff insists that the evidence fully supports her allegation of fraud in the execution of the deed itself. Plaintiff testified that by reason of her poor eyesight she· was unable to read the instrument presented for her signature on January 14, 1944; that the contents of the document were not read aloud for her benefit; that no one informed her it was a quitclaim deed; that, to the contrary, Madge Petrie represented that the instrument was the oral agreement reduced to writing, and that she executed the deed relying on this fraudulent representation. The only other persons present at the signing of the deed were Madge Petrie and the notary public, Fred Hauerwas. Their testimony is substantially the same, with the single exception that the former recalled that Mrs. Pfaff said she knew the instrument was a quitclaim deed. The notary was unable to confirm her statement. He testified that both he and Mrs. Petrie told plaintiff the paper was a quitclaim deed; that he read pertinent portions of the instrument to her, and that, in response to his questions, plaintiff replied that she knew what she was doing and that it was her voluntary act. From the state of the record it is apparent that the finding of both the master and the chancellor for defendants is amply supported by the evidence. In any event, the finding cannot be disturbed, as it is not clearly contrary to the weight of the evidence. (*Zarembski v. Zarembski,* 382 Ill. 622; *Mruk* v. *Mruk,* 379 Ill. 394.) Moreover, a notary public's certificate of acknowledgment to a deed cannot be overcome by the unsupported testimony of the grantor. *Finney* v. *White,* 389 Ill. 374; *Hagen* v. *Waldo,* 168 Ill. 646.

Although the chancellor disagreed with the master and found that plaintiff was mentally competent when she exe-

cuted the deed, counsel for plaintiff does not now contend that the finding is against the weight of the evidence. Suffice it to say that while there is some conflicting testimony, the evidence shows that plaintiff was competent to conduct her own business affairs, fully understood the nature of her acts and knew the import of deeds, mortgages and other similar instruments.

Thirdly, plaintiff urges that there was no meeting of the minds between the parties as to the terms of the oral contract. The alleged absence of mutual assent lies in the testimony that defendants understood they were to furnish plaintiff food and a room for a period of fifteen months only, while plaintiff understood that she was to receive support consisting of board and lodging for the rest of her life. The master reconciled the directly conflicting testimony by finding that there was a mutual mistake. In a well-considered opinion the chancellor overruled the master and found in favor of defendants on the theory that plaintiff's testimony was untrustworthy. A large proportion of the testimony is diametrically conflicting. Principally, this results from plaintiff's flat denials of all of defendants' testimony not capable of proof by disinterested third persons or by documentary evidence. Plaintiff denies too much. The notary public, whose only meeting with plaintiff took place when the deed was executed, testified that plaintiff used her reading glass in affixing her signature to the deed. In her rebuttal, plaintiff denied all the notary's testimony, including the fact that she had used her reading glass in signing the deed. Defendants testified that plaintiff first met Madge Petrie's brother, Joseph McGinnis, at defendants' Thanksgiving dinner in 1939. McGinnis himself so testified. For some strange reason plaintiff denies that he was present on that occasion. Furthermore, plaintiff denied a multitude of details found in defendants' testimony concerning the negotiations that occurred in the winter of 1939-1940. By her denials she, in effect, charges

the defendants with manufacturing, remembering, and being consistent among themselves as to a rather complicated and unimportant series of events.

Our view of the unimpressive character of much of plaintiff's testimony is strengthened by her several innuendoes. For example, plaintiff testified that defendants had sold her furniture, with the attendant inference they had done so without authority, and had retained the proceeds; that she had been locked out of the house on several occasions, and that, some time after the commencement of their communal living arrangements, a sum in excess of $500 disappeared from her room. Later in the trial, it developed that Madge Petrie advertised the sale of the furniture at plaintiff's own request, that she had assisted plaintiff in showing the furniture, and that plaintiff had received the entire proceeds of the sale. Plaintiff had been locked out of the house only to the extent that on one occasion the defendants, upon returning home late in the evening, had supposed plaintiff was in bed and locked the front door leaving the key in the lock, and plaintiff, when she returned, had difficulty in awakening the defendants. On the second occasion, plaintiff did not have her key, and defendants were not there to let her in because they were visiting with friends. Plaintiff did not press the point concerning the money that "disappeared" from her room.

Plaintiff contends that her testimony should be taken at face value because it is inconceivable that she transferred her right of redemption in return for room and board for fifteen months when Albert Dockterman had offered her $1000 and the right to remain in possession for three or four months. The record is silent as to whether the realtor knew of the judgment liens and took them into consideration in making his offer. Secondly, it must be noted that plaintiff would have to vacate the premises ten months

earlier under Dockterman's proposal. It thus appears that there was but slight difference in the value of the two offers. On the other side of the picture, it appears somewhat difficult to believe that defendants agreed to support plaintiff for the rest of her life, in addition to their obligation to redeem the premises, pay all back taxes and buy up all judgments against the property, all for and in consideration of plaintiff's almost negligible equity in the property in controversy.

The principal ground on which plaintiff relies for a reversal is that there was such a failure of consideration on the part of the defendants in providing support for the plaintiff and in redeeming the premises that a court of equity should grant relief by setting aside the deed. While plaintiff states the law correctly, (*Corzine* v. *Keith*, 384 Ill. 435; *Didiuk* v. *Karpuk*, 348 Ill. 98; *Fabrice* v. *Von der Brelie*, 190 Ill. 460,) she takes an overly optimistic view of the testimony. First, as to the promise of defendants to provide room and food during the fifteen-months' redemption period. Plaintiff does not contend that she was not furnished with a room during that period and, indeed, it appears that the parties are still living together. The most satisfactory view of the testimony relating to defendants' furnishing plaintiff with meals is that after a series of quarrels between the parties, plaintiff, in August, 1944, refused to eat with the defendants and, thereafter, ate and paid for her meals at the home of Mrs. Schmid. Thus, plaintiff refused to allow defendants to carry out their part of the contract, and of this she cannot now complain.

In paying up back taxes, totaling $620.89, and in buying up all the unpaid judgments outstanding against the premises for $1570, defendants lived up to the letter of their agreement. Not only this they did, but more. Bills for water rent, plumbing repairs, decorating, reroofing, and

painting, totaling some $300, were paid for by defendants. Lex Petrie also testified that he spent six hundred hours in cleaning up the premises and in improving the lawn.

Lastly, defendants sought to redeem from the master's sale. The undisputed evidence shows that on December 2, 1944, they negotiated for a $6000 mortgage loan on the premises, and that it failed to go through only because plaintiff refused to sign a disclaimer required by the prospective mortgagee. Defendants were thus prevented by the act of plaintiff from obtaining the funds with which to redeem. Their failure to redeem can be laid directly to the conduct of plaintiff. Defeated on this score, defendants did more than required of them by the oral contract, namely, they entered into an agreement with Handelman and Wiesman for the purchase of the master's certificate of sale for a consideration of $6500. Redemption by Marie E. Kaufman, a judgment creditor of plaintiff, nullified defendants' second attempt to redeem. Nevertheless, they subsequently bid in the property for $9900 at the sheriff's sale on execution. Under no one's view of the oral agreement were defendants required to obligate themselves so heavily. Analysis of the evidence shows that defendants carried out their part of the oral contract as far as they were able and accomplished a substantial performance of their duties. All delays and nonperformance may be laid directly to the conduct of plaintiff. Such failure to perform is excused where prevented by the other party to the contract. *Ginter* v. *Heco Envelope Co.* 316 Ill. 183; *City of Chicago* v. *Chicago and Western Indiana Railroad Co.* 105 Ill. 73.

Plaintiff's contention that the findings of the master in chancery, based on conflicting evidence, are entitled to much consideration by this court is not without merit. (*Fisher* v. *Burgiel,* 382 Ill. 42; *Kosakowski* v. *Bagdon,* 369 Ill. 252.) Nevertheless, having accorded the master's findings

due consideration, we are in nowise bound to follow such findings when our examination of the record convinces us that he has erred in appraising the evidentiary value of the testimony. *Stasch* v. *Stasch,* 355 Ill. 581; *Thatcher* v. *Kramer,* 347 Ill. 601.

The decree of the circuit court of Rock Island county is affirmed.

*Decree affirmed.*