(No. 29739.—
EMMA COPPENS *et al.*, Appellees, *vs.* CHARLES COPPENS *et al.*—(FRANK X. HONSA *et al.*, Appellants.)

*Opinion filed November 20, 1946.*

Andrew Kopp, of Moline, for appellants.

Ben A. Stewart, and Roy H. Glockhoff, both of Rock Island, for appellees.

Mr. Justice Fulton delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Rock Island county ordering the partition of real estate improved by a dwelling house containing three apartments and removing as a cloud upon the title a certain agreement regarding said premises, dated September 11, 1936, signed by the plaintiff and two of the defendants, by the terms of which the defendants were to have, rent free, one apartment as long as they should live and were to pay one half of the upkeep of the premises, and by which agreement plaintiff agreed to bequeath to these defendants or their heirs this property.

In 1933 Mina Meersman died and by the terms of her will she bequeathed the life use of the premises to her daughter Emma, with remainder to another daughter, the defendant Hannah Honsa. At that time the daughter Emma was about 42 years old, unmarried and lived with her parents. She continued to occupy these premises with her father until his death. The property was very heavily

mortgaged and there were claims filed against Mina's estate but no assets available for the payment thereof. In an effort to preserve these premises as a home for the parties, the executor and his attorney endeavored to refinance this indebtedness which consisted of a first mortgage upon which there was due approximately $3700 as principal, accrued interest and real-estate taxes of more than $400, second mortgage against the premises in the amount of $1175.78, two claims filed against the estate, one in the amount of $1500 and one in the amount of $255.65, and in addition a balance due of $400 for a boiler and heating plant previously installed in the premises. The total liens and claims against these premises amounted to $7430. There is considerable doubt that the value of the property at the time of Mina's death exceeded $6000, and it is undisputed that the amount due on the mortgages and claims exceeded the fair value of the property at that time.

The executor entered into negotiations with the various lienholders and claimants. In order to obtain a new mortgage loan on the property it was determined that Emma obtain the entire title, inasmuch as she was only given a life interest by her mother's will. In 1935 the executor's attorney wrote a letter to the defendants and appellants in which he explained the refinancing plans. He enclosed a quitclaim deed requesting the Honsas to execute the same, transferring all of the title to Emma. This letter also stated that he and the executor were going to have Emma sign a stipulation in which she would agree that the remainder interest conveyed by this deed was only for the purpose of aiding the securing of a loan and that subsequent to the date of the loan Emma would reconvey to the Honsas their interest. The Honsas were living in Minnesota at that time and executed the deed and returned it to the attorney for the executor. The same was recorded and a loan was obtained from the Home Owners Loan Corporation. The executor added $400 to the proceeds of

the loan and paid off the first mortgage indebtedness. A new second mortgage was executed by Emma and she likewise executed promissory notes and assumed the payment of the other claims filed against the estate. The executor continued to manage the property.

In March, 1936, the Honsas moved from Minnesota to Moline and being in need of a place to live they talked with the executor and as a result one of the apartments was rented to them and a rental was agreed upon for $30 per month. They paid this sum each month until April 1, 1944. Emma never reconveyed any interest in the property to the Honsas in spite of the fact that she had been requested to do so. On September 11, 1936, while Emma was still unmarried, she and the Honsas executed an instrument as follows:

"Moline, Ill., Sept. 11, 1936

I Emma Meersman hereby agree to the following: After all debts are paid against said property known as the East one hundred (100) feet of lot one (1) in block (5) in Osborn's 2nd addition on the bluff in the city of Moline, County of Rock Island and State of Illinois, Frank X. Honsa and his wife Anna Honsa shall live in one apartment of said property as their home, rent free, as long as they shall live. One half of upkeep shall be assumed by each party or parties such as taxes, insurance, water rent and repairs.

According to the last will of my mother, Mina Meersman, I also at my death bequeath to Frank X. Honsa and wife Anna Honsa or their heirs this said property.

(Signed) Emma Meersman
(Signed) Frank X. Honsa
(Signed) Anna Honsa"

This was acknowledged before a notary public, being prepared by another sister without the aid of legal counsel. The Honsas were entirely satisfied with this agreement and there was nothing more said about their interest for several years. They continued paying $30 per month but they never offered to pay half of the upkeep of the property nor were they ever informed as to the amount thereof.

Likewise, it is not clear whether the parties considered that they were to pay the $30 per month until the debts were paid and then pay only one-half of the upkeep or if they were to not pay any on the debts but pay only half of the upkeep. The executor continued to manage the property until after the marriage of the plaintiff. It appears that during this time the property about "carried itself." There is evidence of several conversations between the executor and Emma's husband regarding the "taking over" of the property by Emma and her husband, and in September, 1938, Emma's husband took over the active management and operation of the property. The evidence indicated that Emma's husband was taking over the property in his own behalf, inasmuch as he paid off the indebtedness out of his own funds and began to improve the property by installation of a stoker and making other much needed repairs. The Honsas were both aware of this activity by Emma's husband; in fact, he hired Mr. Honsa to work in making certain repairs and Honsa admits receiving payment for his work performed on the property. Shortly after Emma's husband "took over," Emma, her husband and Hannah Honsa had a conversation in regard to the taking over of the premises by Coppens. Emma states that in this conversation Hannah said, "The agreement between us since Charles took the place over, I don't think it's any good any more." Emma then said, "I don't think so either; I don't consider it's mine since Charlie took it over for the mortgage." Hannah then said, "We'll destroy it." Coppens corroborates this conversation but the Honsas denied the incident. The Honsas failed to produce their copy of the written agreement of September 11, 1936, but on July 12, 1939, this agreement was recorded without any knowledge thereof by the Coppenses. The first knowledge that the Coppenses had thereof was when they attempted to sell the property in 1943 when the same was shown on their abstract of title. In May,

1943, Emma's husband entered into a contract to sell the premises for $6700, but this sale was not consummated because the purchaser did not accept the title with the agreement of September 11, 1936, on record. At about this time Mrs. Honsa wrote Emma and her husband a letter by which she complains of her treatment and states, "It seems ever since you asked me to sign my rites off the will Ive just been ignored yet it was Mamma's will that my children were to get the property after you did promis to do that just the same, but like it always goes once its not on paper anymore it dosnt mean anything. as long as you get yours out of it just forget us altogether and forget you had a sister we'll drop it rite now and never mention it again just leave us to our selves Ill like it better Frank called Emil last nite we just tried to find out more about the deal and that was all. I hope you sell it rite now."

After this sale fell through Coppens offered to sell the property to the Honsas for $6000. A few days later Honsa offered to buy the property from Coppens for $4000. Later Coppens offered Honsa $1000 for a quitclaim deed which was refused.

Plaintiff, Emma, contends that the instrument of September 11, 1936, has been cancelled because the Honsas have never contributed one half of the upkeep of the premises, and because they have not contributed anything towards the repairs nor have they paid any of the debts against the property. She further contends said instrument was abrogated and cancelled by mutual consent of the parties. The defendants contend that they executed their quitclaim deed and delivered the same to Emma on the condition that she would reconvey to them and they ask that said quitclaim deed should be set aside and cancelled. They deny that they occupied said premises as tenants and deny that the $30 per month which they paid has been paid as rent. They contend that the plaintiff and her husband have attempted to defraud them of their interest in

the premises by attempting to sell the premises and by commencement of a quiet-title suit and of a forcible-entry-and-detainer suit against them. They say that because of these things they have refused to make any further contributions in money, services or materials in regard to said premises. The defendants also filed a counterclaim setting forth the same matter and seeking to have their quitclaim deed and the instrument of September 11, 1936, cancelled.

The matter was heard before the chancellor who found the equities with the plaintiff, and a decree for partition and removing as a cloud on the title the agreement of September 11, 1936, was entered.

The Honsas set forth twenty errors upon which they seek a reversal of this decree. They argue that the property is impressed with a trust and that, the property being so impressed, the trustee is under a duty to deal fairly with the beneficiaries; and that there is an agreement by Emma to devise the property, and that her action in attempting to sell the same is a breach of that agreement.

The chancellor heard the testimony in open court and had an opportunity to see the witnesses and listen to their testimony from the stand and we will not reverse his findings unless we are able to say that they are palpably contrary to the weight of testimony. (*Hadley* v. *White,* 367 Ill. 406, *Cook* v. *Wolf,* 296 Ill. 27.) Where the evidence is conflicting and witnesses are heard in open court, an error in finding as to the facts must be clear and palpable to authorize a reversal. *Rothenberg* v. *Rothenberg,* 378 Ill. 242; *Elmstedt* v. *Nicholson,* 186 Ill. 580.

At the time the Honsas executed their quitclaim deed, pursuant to the request of the attorney for the Mina Meersman estate, the evidence indicates that the attorney was acting for the best interests of all people interested in the estate and particularly was he acting in the interests of Emma and the Honsas since at that time the value of the property in which Emma was given the life estate and

Mrs. Honsa was given the remainder did not equal the indebtedness against the property. When the agreement of September 11, 1936, was executed the rights of Emma and the Honsas were settled thereby and the rights of the parties to this suit must be determined by that agreement.

It must be borne in mind that at the time of the execution of this agreement the Honsas were paying $30 per month as rent which was being used to help defray the expenses incident to the operation of the property. In view of this fact we believe this agreement, though ambiguously worded, contemplated that the Honsas were to continue paying $30 per month until the indebtedness against the property had been paid, at which time they were to receive an apartment, rent free, and were to pay one half of the ordinary expense incident to the ownership and operation of the property. In forming this conclusion, we are not unmindful of the fact that the law provides that the life tenant shall pay taxes and keep the property in repair. (*Huston* v. *Tribbetts,* 171 Ill. 547.) Likewise, the law provides that when a life tenant pays off a preexisting mortgage the life tenant is entitled to contribution from the remainderman. (*Jones* v. *Gilbert,* 135 Ill. 27.) By the terms of their mother's will, Emma was given the life use of this property and the Honsas had no possessory rights in same until Emma's death. By the agreement of September 11, 1936, they were given certain possessory rights and in exchange therefor agreed to pay one half of the ordinary expenses, when the debts had been paid, of the property. The parties signed this agreement, the same was acknowledged before a notary public, and the evidence indicates that all the parties willingly entered into this agreement and understood the terms thereof and acknowledged that the same was a settlement by the respective parties of all their rights in said premises.

Therefore, from the foregoing it will be seen that if the decree in this cause is to be affirmed, the evidence must

show that this agreement of September 11, 1936, was, in fact, abrogated, cancelled or otherwise rendered ineffective. The testimony is very conflicting on this element of the case. Both Emma and her husband testify that Mrs. Honsa stated that she regarded the agreement as cancelled and that she and her husband would destroy their copy of the same. Mrs. Honsa denies this testimony. It appears that the Honsas recorded their copy of this agreement subsequent to the time this conversation is supposed to have occurred. The chancellor found that the said agreement had been cancelled by Mrs. Honsa's statement made to Emma and her husband. However, there is no evidence which indicates that Honsa ever intended to destroy said instrument. On the contrary, his testimony shows that he recorded the instrument subsequent to this conversation had by his wife with Emma and her husband. It does not appear from the evidence that he has in any way conducted himself in such a manner as to be estopped from asserting his claims under the agreement of September 11, 1936. It is true that he performed work upon said premises for which he was reimbursed; however, such reimbursement was made in the way of giving him credit against the rent which he was paying. This is not conduct in any way inconsistent with the Honsas' claims to said property, since the services performed by him were services for which payment would have to be made to someone and paying him, therefore, was probably the simplest way to keep track of the work he was performing and the credit to which he and his wife would be entitled.

Much point is made of the letter written by Mrs. Honsa to Emma and her husband shortly before the proposed sale of the property. While Mrs. Honsa refers to the property as "your house," she likewise indicates in the letter that the Honsas still have some interest in the property since she mentions that they too have endeavored to find purchasers. Even if this letter can be construed as indicating

that she claims no interest in the property, it does not bind her husband.

It has been held that a fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other; likewise, the fiduciary relationship includes not only legal and technical relations such as guardian and ward, attorney and client, principal and agent, and the like, but it extends to every possible case in which a fiduciary relationship exists in fact and in which there is confidence reposed on one side and resulting domination on the other. (*Fisher* v. *Burgiel,* 382 Ill. 42; *Kosakowski* v. *Bagdon,* 369 Ill. 252.) The relationship need not be legal, but it may be moral, social, domestic or merely personal. (*Staufenbiel* v. *Staufenbiel,* 388 Ill. 511.) In the case at bar, all minds would agree that the executor and his attorney occupied a fiduciary relationship with both Emma and Hanna. When Emma's husband took over the actual operation and management of the property he, in fact, assumed the same relationship which had been previously occupied by the executor and his attorney, and it is our opinion that a fiduciary relationship existed between Emma's husband and the Honsas. That being the case, the burden is upon Emma and her husband to establish by clear and convincing proof the fairness of the transactions between them and the Honsas. (*Fisher* v. *Burgiel,* 382 Ill. 42; *Children's Home of Rockford* v. *Andress,* 380 Ill. 452.) Likewise, where the fiduciary relationship exists it is necessary for the person occupying that position to show by clear and convincing evidence that a transaction wherein the other party releases any and all claim which he had against the fiduciary relationship has actually taken place. It is our belief that this has not been done in the case at bar. Certainly, the appellants had an interest in the property by the terms of the agreement of September 11, 1936, and while there is some dispute and conflict as to what occurred there-

after regarding the cancellation of that agreement, the facts that the agreement was recorded by one of the appellants, and that the appellants continued to act with reference to the property the same as they had previously, indicate that the same was not, in fact, cancelled.

The appellants in this case have offered to do equity. However, they claim that because of the fraudulent conduct on the part of Emma and her husband they should not be required to reimburse Emma and her husband for the payments made by them on the various indebtednesses against the property. While it is true that Emma did not reconvey the remainder to the appellants as had been agreed by the attorney and the executor, and while the evidence indicates that she was requested to make this reconveyance several times and refused to do so, it is not the opinion of this court that Emma and her husband have been guilty of fraud in dealing with these appellants. Therefore, Emma and her husband are entitled to, and should, receive proper reimbursement for the expenditures made by them in the payment of indebtedness against this property and improvements made thereto. If, as the appellees contend, the property is not worth the amount of the expenditures made, they will receive the same benefits as the original decree gave them. However, if, upon the sale, the property brings a much greater sum, appellees will be reimbursed for their expenditures and appellants will receive their just share in the proceeds.

For the reasons stated, that portion of the decree granting partition of the property is affirmed, that portion of the decree removing as a cloud upon the title the agreement of September 11, 1936, is reversed, and that portion of the decree dismissing the counterclaim for want of equity is affirmed and the cause is remanded to the circuit court of Rock Island county with directions to take an accounting between the parties of their respective expenditures in behalf of said premises and from the proceeds of

the sale, after payment of the costs of these proceedings, to first pay to Emma Coppens and her husband, Charles Coppens, full reimbursement for the expenditures made by them in the payment of indebtedness against the property and improvements made thereto and if, after payment of the foregoing, there be any remainder, it shall be apportioned between the parties in accordance with the views expressed in this opinion.

*Affirmed in part and reversed in part and remanded, with directions.*