Lucile R. Kovac, Plaintiff-Appellee, v. Joseph A. Kovac, Defendant-Appellant.

### Gen. No. 11,351.

Second District, First Division.

April 26, 1960.

Rehearing denied June 6, 1960.

Walter C. Wellman, of Chicago, for appellant.

Eckert, Caldwell, and Gleason, of Woodstock, for appellee.

JUSTICE SPIVEY delivered the opinion of the court.

This appeal was originally lodged in the Supreme Court of Illinois and was by that court transferred

here with a finding that the appeal was wrongfully taken to that court.

It had been urged that the defendant had been deprived of certain constitutional rights. By transferring to this court all alleged constitutional errors assigned were disposed of.

The cause was heard by the Circuit Court of McHenry County without a jury. It was stipulated that only the issue of divorce and separate maintenance would be heard, and that all other issues joined would be reserved for further hearing by the Court.

The issues were joined and heard on plaintiff's complaint for divorce charging desertion and cruelty (or in the alternative for separate maintenance on the same grounds) filed February 15, 1957, defendant's answer to the complaint filed April 30, 1957, and plaintiff's reply to the answer filed May 14, 1957; plaintiff's amendment to the complaint filed July 15, 1958, and defendant's answer to the complaint as amended filed July 29, 1958; plaintiff's supplemental complaint for divorce charging that since the filing of the original complaint the defendant has been guilty of committing adultery and certain other acts of extreme and repeated cruelty, filed February 18, 1959, by leave of court, defendant's answer to and motion to dismiss plaintiff's supplemental complaint filed February 19, 1959, and plaintiff's reply thereto filed February 24, 1959; plaintiff's amendment to her supplemental complaint filed February 27, 1959; and upon defendant's counter-complaint for divorce charging desertion and habitual intoxication filed July 15, 1958, and plaintiff's answer to the counter-complaint filed August 4, 1958.

On February 27, 1959, the chancellor entered an order finding among other things that the plaintiff is now, and for more than ten years had been, an actual resident of McHenry County, Illinois, before the fil-

ing of her original complaint and her supplemental complaint, that the defendant had on or about January 24, 1959, committed adultery with a woman named Terry Resch as charged in plaintiff's supplemental complaint as amended, that defendant has failed to maintain the charges alleged in his counter-complaint, and that the same should be dismissed for want of equity, and that a decree of divorce should be entered upon the supplemental complaint. The order therein ordered, adjudged, and decreed (1) that the bonds of matrimony be dissolved (2) that the counter-complaint of the defendant be dismissed for want of equity (3) that the foregoing constitutes a final and appealable decree and there is no just reason for delaying enforcement (4) that all other questions raised by the pleadings and still pending are reserved for further consideration of this court, and that until further order, defendant shall comply to the temporary alimony and support order of December 17, 1958.

The appeal was perfected pursuant to the provisions of Section 50 (2) of the Civil Practice Act, Chap. 110, Sect. 50 (2), Ill. Rev. Stat. 1957, and limited in its scope by the notice of appeal to the decree of February 27, 1959; "whereby it was decreed that Plaintiff be awarded a divorce on the grounds of adultery and that Defendant and Counterclaimant's Counterclaim for Divorce be dismissed for want of Equity."

Defendant's assignments of error cognizable before this court are (1) lack of jurisdiction of the subject matter in that plaintiff was not a resident of Mc-Henry County, Illinois, at the time of filing her supplemental complaint and the hearing thereon (2) failure to establish a prima facie case of adultery (3) findings of the court and decree against the manifest weight of the evidence (4) that the court erred in overruling defendant's objections to evidence and mo-

33

tions to exclude testimony and (5) that the court erred dismissing defendant's counterclaim for want of equity.

Joseph and Lucile Kovac were married on August 2, 1933, and two children were born of the marriage, Elyse, age 18, and Judith, age 15. The family lived in a thirteen room mansion in Crystal Lake, Illinois, in McHenry County for over ten years preceding their troubles. The record indicates their lives were not serene prior to September, 1954, the date when the events leading up to the instant case commenced.

On September 1, 1954, the defendant established an apartment in Chicago. According to plaintiff's version, defendant said he was going to take all his clothes and move to Chicago. The defendant contended the separation was by mutual agreement because of plaintiff's unhappiness over their marital affairs and due to business reverses he was required to spend more time in Chicago where his office was located, and he would prefer to move so the children might continue with their school, and he would come home weekends.

It is fair to say that until January 1, 1957, the defendant made periodic visits to the marital residence, that plaintiff on occasions visited his apartment in Chicago remaining overnight, that they took two trips together, and that they on some of those occasions lived as man and wife. It is further undisputed that the defendant supported the family in some fashion until the latter part of May, 1957.

In addition to the foregoing, certain facts in detail are important to the issues raised by this appeal.

Lucile Kovac testified that until November 4, 1958, she lived in the marital residence in Crystal Lake, and since said date she had been staying with her daughter in Barrington, Illinois, for the reason that for a year and a half she had not been receiving any support from her husband; that she was a registered voter

of McHenry County; and that when things were settled she will move back to her home in Crystal Lake if she can afford it and make a go of it. It was admitted in the pleadings that she had removed certain household goods and stored them for safekeeping when she moved in with her daughter.

The plaintiff further testified that on May 1, 1956, she accompanied her daughter to a medical center in Chicago for a physical examination, and upon her daughter's refusal to submit to an examination, the defendant stamped on his daughter's foot; that she attempted to restrain him, and that he pushed her out of the way; that they went to the street where defendant knocked his daughter in the head and threatened to take care of both of them; that on May 4, 1956, in their home in Crystal Lake the defendant beat his daughter over the head, legs and shoulders with a whip he had purchased for the occasion; and that on May 19, 1956, when she asked defendant if he intended to use the whip any more, he twisted her arm and threw her out of the room and locked the door.

To substantiate her allegation of adultery, the plaintiff testified that on January 25, 1959, she in the company of six detectives went to the defendant's apartment in the Park Dearborn Hotel in Chicago at about 11:50 p. m. She knocked on the door and defendant said, "Just a minute," and in about a minute he opened the door. She walked in first, followed by the men. He tried to push the door back on her but couldn't because these men were behind her. He said, "Get out of here," and swore. He hit her in the ear with his fist, knocking her to the floor. Her husband was swinging at all of the detectives, and they were trying to restrain him. Someone picked her up and she stepped out in the hall. He came out in the hall and again struck her in the temple with his fist.

Plaintiff further testified she had marks on her ear and a lump in the middle of her head and a large black and blue mark on her thigh and her left ear was bleeding.

Plaintiff testified at the time she entered the room that Terry Resch was standing by a table; that her husband's clothing was disheveled; that his shirt was open, and that he was wearing no shoes and no coat. Terry Resch was not related to either of the parties, and she presumed her to be about twenty-five years of age. Terry Resch was dressed but was in her bare feet.

She admitted that she had commenced a suit for divorce in the Superior Court of Cook County on May 24, 1956, charging the defendant with extreme and repeated cruelty and, more particularly, acts of cruelty on May 1, 1956, and May 5, 1956. She admitted that at that time she was aware of the defendant's act of cruelty on May 19, 1956, at the marital residence. She stated that she had obtained a writ of injunction in this case restraining the defendant from striking, beating, molesting, or injuring plaintiff or the minor children and enjoining the defendant from entering the marital residence. This suit was dismissed on about June 23, 1956.

Joseph A. Gruzak testified that he was an employee of the Acme Secret Service and was assigned to follow Joseph Kovac; that on the 30th day of December he saw Mr. Kovac at about 4:30 come out of his office and walk to the Toffenetti Restaurant on Randolph Street; that he remained there about an hour and then took a cab to the Jewel Food Store close to the defendant's apartment building and then walked to his apartment.

The witness testified that on December 31, 1958, he saw Mr. Kovac leave his office at about 1:30 p. m.; that he walked to the Zimmerman Liquor Store and

36

then returned to his office. Mr. Kovac came out again from his office about 4:30 and took a taxicab to the Park Dearborn Hotel; that he next saw Mr. Kovac come out of the elevator in his apartment building at about 7:30, and after having a cup of coffee in the drug store, he went to the Ambassador East Hotel, then returned to the Park Dearborn Hotel about 10:00 p. m.; that at 9:45 witness noticed that a piece of transparent tape he had placed on Mr. Kovac's apartment door was broken; and that on that occasion he heard a woman's voice in Mr. Kovac's apartment which was rather rough and harsh.

Witness testified that at 10:45 Mr. Kovac and Terry Resch left his apartment and took a cab to the Palmer House Hotel; that he, Gruzak, returned to the Park Dearborn about 1:30 on January 1, 1959, and remained on the eighth floor at the stairway; that at 4:00 in the morning Mr. Kovac and this woman came out of the elevator, and he heard the woman say, "This is the first time I have been here this late." She opened the door and they entered the apartment. He went to the door and listened, and heard Mr. Kovac say, "You are beautiful." He heard other muffled voices and words. He placed a piece of Scotch tape on the door and then called his office. He returned to the eighth floor at about 7:30 in the morning and found the tape broken and a "Do not disturb" sign on the door.

Witness Gruzak further testified that he saw Mr. Kovac in company with this woman again on January 10, 1959. At 8:30 that evening Mr. Kovac left the Park Dearborn Hotel, went out the front entrance, entered a white 1958 Lincoln which he drove to the Sheraton Plaza Hotel where he got out of the car with Terry Resch; that they came out of the Sheraton Plaza Hotel at about 9:45 and drove south on Sheridan Road. He saw Mr. Kovac again that night about 12:50 enter the Park Dearborn Hotel and go up to his room alone;

that he again saw Mr. Kovac on January 16, 1959, at about 5:30 in the Toffenetti Restaurant, and that he saw Terry Resch in the restaurant where she acted as a hostess and that he heard her voice on that occasion; and that it was the voice he heard at the door of the apartment on a previous occasion.

Walter Stafford, a private investigator also employed by the Acme Secret Service, testified that on January 10, 1959, he arrived at the Park Dearborn Hotel at approximately 7:30 in the morning where he met Joseph Gruzak; that they checked Mr. Kovac's room and found the tape which had been placed on the door the night before was unbroken and that Mr. Kovac came out of his room and went to the Bismarck about 11:45 a. m.; that at about 5:00 the defendant went to the Toffenetti Restaurant on Randolph Street and remained until about 6:00; that he had several short conversations with a woman who appeared to be the hostess or manager.

Mr. Kovac then left the restaurant and returned to his apartment and again left the hotel about 8:30, entered a 1958 Lincoln Sedan, and she moved over and Mr. Kovac got into the driver's seat; that they drove to the Sheraton Plaza Hotel, with the witness following, which they entered and came out again about 9:45.

Witness further testified that on January 24, 1959, he arrived at the Park Dearborn Hotel at approximately 10:50 a. m., and the first person he saw was Terry Resch, the same woman who had been with him the night at the Sheraton Plaza, who came out of the elevator at approximately 11:00 a. m.; and that she walked south to the parking lot and got in the Lincoln Continental automobile, which was the same car, she drove to a parking lot, and went in the Toffenetti Restaurant.

Stafford testified that he returned to the apartment and Mr. Kovac came out of the elevator about noon, got in a cab and went to the Bismarck Hotel; that he left the Bismarck about 2:30 and went to the Toffenetti Restaurant, took a seat at the rear counter, had a few short conversations with Terry Resch, and left about 3:30. About 8:00 Mr. Kovac took a cab to the State Lake Theater, purchased two tickets, and was later joined by Terry Resch.

Witness returned to the hotel at 10:00 that night and saw them enter room 805 at about 10:35. At about midnight he rapped on the door and it was opened by Mr. Kovac; that defendant attempted to strike Mrs. Kovac and succeeded in hitting her with his fist, and she fell to the floor. Terry Resch was also in the room; and that Mr. Kovac had on brown trousers, he was in his stocking feet, his hair was mussed, his shirt was open at the top, possibly three or four buttons. Terry Resch was bare footed, her hair was mussed, and her dress was in disarray, it looked trumpled.

Kovac threatened all of the detectives and said, "I will throw you all out"; that Mrs. Kovac identified her husband; that he struck at Mr. Risberg who was taking a photograph, knocked the camera to the floor, and kicked at it; that about 12:30 Mr. Kovac put Terry Resch in a cab and that the witness followed her to the Press Inn, which is a tavern on North Sheridan Road.

Hubert Bumgardner, a private detective employed by Acme Secret Service, testified that he saw Terry Resch on January 16 at about 5:30 at the Toffenetti Restaurant; that he saw her talk to Mr. Kovac several times; that at 8:25 Terry Resch came out of the restaurant and took a cab to the Park Dearborn Hotel; that he rode up on the same elevator with her, and that she got off on the eighth floor and entered room 805

after knocking; that she came out about 9:10 with Mr. Kovac and they went downstairs to the Cafe de Paris and went back upstairs at about 11:55; that Terry Resch opened the door with her key, and at about 12:50 she came out alone, went to the parking lot, and entered a Lincoln Continental.

Witness further testified that on January 24, Mr. Kovac and Terry Resch entered room 805 at about 10:35; that at about midnight he, accompanied by Mrs. Kovac and the other detectives, entered the room; that defendant began swinging at and pushing, striking Mrs. Kovac once or twice and knocked her down; that he swung at witness very hard and repeatedly he knocked his hat off and hit him around the shoulders mostly and tried to push him out; that Terry Resch was in the room in her stocking feet and was standing back toward the kitchen; her dress was kind of mussed up, her hair was mussed a bit; that Mr. Kovac's shirt was unbuttoned at the top and was mussed up. Mr. Kovac's shoes were on the floor near the divan. There was a television in the room but that he did not believe it was on.

Robert Risberg, Office Manager of Acme Secret Service, testified that he went to the Park Dearborn at about 11:00 and that he had a camera with him; that he saw Mr. Kovac with Terry Resch enter room 805; that upon Mrs. Kovac's entering, defendant hit her in the face with a very sharp blow causing her to fall down, and that he again hit her out in the hallway; and that he started taking pictures.

The witness thereupon identified five photographs taken on that occasion (which were admitted into evidence and which tend to corroborate the testimony of plaintiff's witnesses on the occasion of their visit to defendant's apartment on the night of January 24, 1959); that he looked into the bedroom which contained two beds, one was mussed up and the sheets were thrown astray, and the pillow was thrown

astray; and that he had seen Terry Resch on January 16 or early morning of the 17th coming out of the elevator at the Park Dearborn Hotel.

Morris Ader, who operates the Acme Secret Service, a licensed private detective, testified that on January 24 he was at the threshold of the bedroom in the apartment and there were two beds, one was in order and the other was mussed, and that he saw Terry Resch in the room, her hair was mussed and she was bare footed.

Joseph Kovac, in his defense and to sustain the allegations of his counter-complaint alone testified. He stated he had lived in Chicago, Illinois, since January 1, 1957, and that he was not living with his wife at the present time having separated January 1, 1957; that he had a conversation with his wife on September 1, 1954, at which time she stated that she was unhappy about their marital affairs, and that she planned to move to Chicago with the children immediately; that he told her at that time it would not be fair to take the children out of school and that due to substantial business reverses he was required to devote more time to working at his office; and that the time spent in commuting was substantial, that he would prefer to move to Chicago personally so that the children could continue with their school immediately after Labor Day, and that he would come home on weekends unless it was necessary for him to be out of town.

He stated in reply his wife said that would be all right and he then moved to Chicago immediately, taking enough clothing to last for a week. He saw her weekends, that he spent the holiday season in 1954 at home, and that he paid the bills, and that he and his wife lived as husband and wife on those occasions.

Defendant testified he was a registered voter at Crystal Lake and voted during the year 1954. He stated that during the year 1955 his wife on occasion

would occupy his apartment in Chicago and that he saw his wife fifty or sixty times during 1955; that in the summer of 1955, he and his wife and children made a four or five week trip to Mexico; and that he saw her regularly on most weekends.

Defendant testified that he saw his wife on January 28, 1956, and on that occasion she told him that if he didn't like the pork roast not to eat it; that after this occurrence he next saw her in the early part of April, 1956, pursuant to her request to return because of problems with the children; and that on May 1, 1956, he was present at the medical center and denied that at any time he had pushed or struck his wife.

Defendant stated that on May 4, 1956, in the marital residence he had whipped his daughter moderately with a whip he had bought that very morning, and that he on that occasion did not at any time strike his wife. On May 19, 1956, at the marital residence there was some difficulty with one of the daughters about retiring and he told his wife that it would probably be best for the family to move into Chicago where he could assert some parental discipline.

Mr. Kovac further testified that he saw his wife on May 23 at the marital residence, and that he talked to her about her impending hospitalization and surgery. He stated that he had not seen his wife from May 24, 1956, to July 23, 1956, in obedience to the injunction writ issued by the Circuit Court of Cook County. He had a conversation with his wife in the early part of 1956 wherein his wife told him that she had consulted an attorney and could make a lot of trouble for him. He told her he would not be intimidated, and that if she wanted to talk with a view toward reconciliation, he would be glad to meet with her. He stated that in the early part of August he told his wife he wanted the family to move in to Chicago; that it would be best to put both daughters

42

in private schools; that subsequently his wife told him she wanted to live at Crystal Lake and not move into Chicago until both girls could go to a private high school together.

On August 16, 1956, he wrote his wife a lengthy letter largely devoted to the raising of the two girls and concluded that in September, 1956, the maintenance, support, and educational facilities at Crystal Lake would be terminated; that the children would be put in private schools and, "You will find for yourself all the necessary personal maintenance and support you need in Chicago, Illinois. Details to be arranged later; " and that the Crystal Lake residence would be closed and every reasonable effort made to dispose of it.

Defendant stated that he saw his wife regularly on weekends and that he spent the Thanksgiving holidays of that year at the marital residence. They made a trip to Hot Springs in the latter part of November, he returning to Chicago on December 14, 1956; that he next saw his wife in Chicago and that she stayed at his apartment one night; that he returned to Crystal Lake on the 21st or 22nd and remained there until after the Christmas holidays, that he bought his wife a thirty-carat topaz birthstone ring with diamonds as a Christmas present; and that he next returned over the New Year's Eve holidays and that a discussion of the conduct of one of the daughters arose. He told his wife he was unhappy with the psychology of the children, and that unless she saw fit to move to Chicago, he did not intend to return to Crystal Lake.

Defendant testified she threw a shoe at him and said, "I don't care whether you ever come back." He returned to Chicago and has not lived with his wife since that date. He stated that he had asked his wife to come and live in Chicago. On June 6, 1957, he again wrote his wife, calling her attention to his letter

43

of August 16, 1956, which reiterated some of the details and stated the program then outlined was temporarily postponed at her suggestion so that one of the daughters would be able to complete her grammar school at Crystal Lake to June 10, 1957, and that his wife was to continue occupying the Crystal Lake residence until June, 1957. The letter concluded that after the daughters graduation from grade school, "You and the children would move into Chicago to live with me in my hotel apartment."

The letter of June 6 further stated that upon that understanding he had continued to support the family. That between October, 1956, and January 1, 1957, they had cohabited as man and wife in Crystal Lake and Chicago, and that since January 1, 1957, they had been living separate and apart. The letter went on to say that now the school year had been terminated by both the daughters, he wanted his wife and children to come to Chicago and live with him at the Park Dearborn Hotel; and that effective June 10, 1957, his wife would find her maintenance and support with him in Chicago.

He further testified that he asked his wife to come and live with him in Chicago after she filed the divorce suit in February, 1957; that he had had no conversation with her personally after the filing of the divorce suit until May, 1957, when she called him about a trip for herself to Virginia to bring back the daughter who was attending school in that State.

Defendant testified that he continued to contribute to his wife's support until the latter part of May, 1957. He stated that he had not talked to her since April or May of 1957; that he had maintained his home in Chicago since December 31, 1956.

Relative to the instance on the night of January 24, 1959, he testified that he and Terry Resch arrived at the apartment at about 10:40 p. m.; that Terry Resch

44

had that morning about 10:45 a. m. dropped off on her way to work with a gift for him, and that she remained at the apartment for ten or fifteen minutes; that he saw Terry Resch later that day at the Toffenetti Restaurant about 3:00 in the afternoon; that he stayed about ten or fifteen minutes; that on his way home he stopped at the grocery store and did some shopping, and then went to his apartment and went to bed and went to sleep; that he slept in one of the twin beds in the bedroom; that no one was there, and he awakened about 7:00 p. m., cleaned up and left the apartment about 8:00 p. m. From there he went to the State Lake Theater where Miss Resch met him in about ten minutes; that they stayed for the show and came out about 10:30, then went to his apartment, arriving about 10:40 p. m.; that he turned on the television and started some water for coffee; that he had taken off his coat when he came in and had taken off his shoes because he had stepped in some water parking the car and had put on his bedroom slippers.

Mr. Kovac further testified that he made some coffee and listened to a television program about 10:45 which ended at midnight; that he heard a knock on the door and said, "Just a minute"; that he opened the door, which was not locked, and was immediately confronted with an overwhelming physical force that catapulted him back about three or four feet; that Mrs. Kovac stepped in about two feet and was asked if she knew that woman, to which she replied, "no," and then stepped back into the corridor.

He stated he resisted this physical intrusion and was knocked to the floor and was pinned by three men on the couch, and that he again demanded that they get out of the apartment or he would call the police. He stated that he did not have sexual intercourse with this woman, meaning Terry Resch, that evening or any other evening; that he had known

45

Terry Resch approximately one year and had had business dealings with her in handling an income tax matter for her; and at one time engaged her to help him make a survey because of her specialized service and training, which was about March, 1958. He denied that any time during the affray he struck Mrs. Kovac.

He stated that on December 31 he saw Miss Resch and they had come to the Palmer House; that they had returned to his apartment about 3:00 a. m. to pick up her satchel-like purse bag; that she stayed about five or ten minutes and left.

A purported pro se answer which was not filed to the Cook County divorce suit was admitted in evidence which admitted that the plaintiff was a resident of McHenry County, Illinois, admits the marriage but denies that the wife had conducted herself as a good and affectionate wife for five years, states that the wife has developed into an irresponsible, unreasonable, and vindictive wife and mother; that she is in the early stages of chronic alcoholism. He further denies that he has been guilty of the extreme and repeated cruelty as alleged and denies that he has a vile temper and denied that he has ever intended to do bodily damage to the plaintiff and minor children.

He further testified that the photograph of Terry Resch in his apartment had been brought there to show him, and she sent it to her friend in San Francisco; that she had it framed that day and planned to send it to a priest friend in San Francisco, a man about 78 years old, that looks on her as a sister.

He stated that the disarray of his clothing was no doubt due to the altercation that took place.

Elyse Roberts, the oldest daughter of the plaintiff and defendant, in rebuttal, testified to the occasion of her refusal to be examined at the Chicago Medical Center, and stated that her father stepped on her foot on that occasion, that he swore at her, and that he

pushed her mother out of the way and went stomping over to the desk where he was to pay the bill. That they got in the elevator and as they hit the ground floor, he pushed her and she almost stumbled on her face; and that upon arriving at the street, he slapped her. That on one occasion she had seen her father push her mother out of the room and that she had scratches on her arm; that on May 4, he had struck her with a whip more than once, and that he hit her on the back of her neck and that she remembered feeling the blood trickle down her shoulder. She testified further that in 1954 that her father would come home weekends occasionally, and that sometimes it would seem that he did not come out for months.

Defendant's first assignment of error questions the jurisdiction of the Circuit Court of McHenry County over the subject matter of the controversy. It is contended in that respect that at the time of the filing of plaintiff's supplemental complaint, amendment thereto, and the hearing on February 27, 1959, plaintiff was a resident of Lake County, Illinois.

■ It is, as defendant contends, mandatory in instituting a suit for divorce that the plaintiff have the residence requirements provided by Sects. 2 and 5 of the Divorce Act, Chap. 40, Sects. 3 and 6, Ill. Rev. Stat. 1957. Section 5 provides in part, "The proceedings shall be had in the county where the plaintiff or defendant resides."

Defendant in his answer to plaintiff's amendment to her complaint admits the allegation that plaintiff is and for more than ten years last past, continuously prior to filing of the complaint, has been an actual resident of the County of McHenry and State of Illinois.

■ Jurisdiction of a court over the subject matter and the parties having once attached in a cause con-

47

tinues until all issues of fact and law have been finally determined.

In Irmegar v. County of Tazewell, 264 Ill. 172, 106 N. E. 227, it was said, "The general rule is, that the jurisdiction of a court over a cause depends on the state of facts at the time the action is brought; that after jurisdiction has once vested it cannot be divested by subsequent events. Change of residence or of the condition of the parties or of the amount of the dispute cannot take away jurisdiction that has once attached. (Tindall v. Meeker, 1 Scam. (2 Ill.) 137; Alley v. McCabe, 147 Ill. 410, 35 N. E. 615; Mollan v. Torrance, 22 U. S. 537; Clarke v. Mathewson, 37 U. S. 163; United States v. Dawson, 56 U. S. 467; State v. Wilkins, 67 N. H. 164; Hawes on Jurisdiction of Courts, sec. 23.)" To like effect, In re 431 Oakdale Avenue Bldg. Corporation, 28 F. Supp. 63.

█ The filing of the supplemental complaint under Section 39 of the Civil Practice Act, Chap. 110, Sect. 39, Ill. Rev. Stat. 1957, alleging new matters occurring after the original pleadings constitutes an amendment to the prior pleadings only and forms a part of and is tried with the original case.

It is succinctly stated in I. L. P., Chancery, Section 295, "A supplemental complaint is, in effect, only an amendment by which new matter transpiring since the filing of the original complaint is brought into the case. Its purpose is to bring before the court facts which came into existence after the original complaint was filed, so that the court may grant relief to a successful plaintiff on the basis of the facts as they appear at the date of the decree."

In Oliver v. Ross, 289 Ill. 624, 124 N. E. 800, the court said, "As the supplemental bill was, in effect, but an amendment to the original bill, by which new matter which had transpired since the filing of the original bill was brought into the case, it formed a

48

part of and was tried with the original case. Mix v. Beach, 46 Ill. 311."

Defendant argues that the action of the court in making no findings on the original complaint amounted to a dismissal thereof and by implication holds that there was no cause of action on the original complaint, and that a decree cannot be based on a supplemental complaint if the plaintiff had no original cause of action. We cannot agree.

71 C. J. S., Pleading, Section 330 (c) entitled "Insufficient Original Cause of Action" states, *"An original complaint which states no cause of action* cannot be remedied, so as to permit recovery, by a supplemental pleading setting up matters which have occurred since the commencement of the action. If at the time the supplemental complaint is filed the original has been rejected on demurrer, or otherwise fully disposed of, the pleadings, as they stand, present no grounds for recovery, since there is no complaint to which the supplemental complaint can be supplemental, and it cannot of itself be made the foundation of an action." (Emphases supplied.)

41 Am. Jur., Pleading, Section 265, states, "If *a complaint states no cause of action,* it cannot be sustained by a supplemental pleading setting up matters that have occurred after the commencement of suit. . . . And it is not a ground of objection that the facts presented by a supplemental pleading constitute new matter if they do not present a new cause of action. Where the matters alleged grew out of and were connected with the same transaction from which the litigation arose, and are germane to the object of the suit, it is proper to present them by a supplemental pleading, although the grounds for relief did not exist when the original complaint was filed." (Emphasis supplied.)

49

■ It is only when a complaint on its face shows that the plaintiff is not entitled to the relief prayed, or upon a hearing even if the allegations alleged in the complaint are proven there is no ground for relief established and the complaint thus disposed of, that a supplemental complaint in itself will not sustain a decree for the plaintiff.

While the cases in Illinois are not numerous on this question, yet there are a few that give credence to our conclusion. Brownback v. Keister, 220 Ill. 544, 77 N. E. 75; Heffron v. Knickerbocker, 57 Ill. App. 339; Lehmann v. Shimeall, 195 Ill. App. 511.

In Miller v. Cook, 135 Ill. 190, 25 N. E. 756, the court said,

"The rule, as we understand it, is well stated by Chancellor Walworth in Chandler v. Pettit, 1 Paige's Ch. 168, and is, in substance, that if an original bill is wholly defective, and there is no ground for proceeding upon it, it can not be sustained by filing a supplemental bill, founded upon matters which have subsequently taken place; but if the original bill is sufficient for one kind of relief, and facts afterwards occur which entitle the complainant to other and more extensive relief, he may have such relief by setting out the new matter in a supplemental bill. In Story's Equity Pleading (8th ed.) sec. 336, it is said: 'A supplemental bill may also be brought, not only to insist upon the relief prayed for in the original bill, but upon other relief different from that prayed for by the original bill, where the facts which have since occurred may require it.' In section 339 it is said: 'To entitle the plaintiff to file a supplemental bill, and thereby to obtain the benefit of the former proceedings, it must be in respect to the same title in the same person, as stated in the original bill.' And in section 346 it is said: 'When an event happens, subsequent to the time of filing an original bill, . . .

which give a new interest to a party, . . . the defect may be supplied by a bill, which is usually called a supplemental bill, and is, in fact, merely so with respect to the rest of the suit, although with respect to its immediate object . . . it has in some degree the effect of an original bill.' "

■ On this score alone we might properly hold that the Circuit Court of McHenry County had jurisdiction of the persons and the subject matter of the instant case.

However, we do not think the chancellor erred in his findings of fact that the plaintiff was a resident of McHenry County at the time of the filing of her supplemental complaint and at the time of the hearing.

■■ Residence being a mixed question of domicile and intent, the facts surrounding the plaintiff's removal from the marital domicile on November 4, 1958, to her abode with her daughter, previously recited in this opinion, do not support a finding that the plaintiff established a new residence in Lake County. The chancellor so found and we will not disturb that finding unless against the manifest weight of the evidence and we do not so find.

■ We note in passing that even if the chancellor was in error in his findings of fact of residence when the supplemental complaint was filed that no error was committed. The allegation of residence was unnecessary in the supplemental complaint and the findings in that respect may be treated as surplusage.

Defendant next contends that the plaintiff has failed to prove a prima facie case of adultery and that the findings of the chancellor that he, the defendant, was guilty of adultery are against the manifest weight of the evidence.

We have at some length detailed the evidence in this case and particularly with reference to plaintiff's

51

charge of adultery. No useful purpose would be served in again referring to the evidence in that respect.

■ Where the chancellor sees the witnesses and listens to their testimony, his findings of fact will not be disturbed unless they are manifestly against the weight of the evidence. Fox v. Fox, 9 Ill.2d 509, 138 N.E.2d 547, Coppens v. Coppens, 395 Ill. 326, 70 N.E. 2d 54.

It was said in Marcy v. Marcy, 400 Ill. 152, 79 N.E. 2d 207, "Where adultery is charged, there is very seldom direct or positive evidence of the acts charged. The parties generally use every effort to conceal the act and usually deny that adultery has been committed, or attempt to explain away the circumstances which indicate adultery. In such a case it becomes very important to test the credibility of the witnesses testifying since it can be assumed that the defendant and anyone with whom she is alleged to have committed adultery would deny the charge. The position of the Chancellor in such a case, therefore, becomes very important, particularly where he has heard all of the evidence and has had an opportunity to observe the witnesses and their demeanor while testifying, their candor or lack of candor and to consider the circumstances in issue."

■ ■ We conclude that the findings of the experienced chancellor in this case are fully sustained by language in the Marcy case wherein it was said, "When the fact and circumstances introduced into evidence fairly and reasonably lead to the conclusion that adultery has been committed the court will be justified in finding the charge sustained."

Neither do we think the trial court erred in overruling defendant's objection to evidence and motions to exclude testimony. We have examined the rulings and find them to be proper.

██ Even if it could be said that the chancellor erred in his rulings on the admission of evidence, it would not be reversible error.

In Purcell v. Weasel, 12 Ill.2d 356, 146 N.E.2d 580 in a similar assignment of error, it was said, Under such circumstances it is presumed that only competent evidence was considered and an error in admitting evidence does not require reversal when the remaining evidence is adequate to support the judgment. To like effect, Webb v. Commercial Credit Corporation, 24 Ill.App.2d 75, 163 N.E.2d 727, and Weinebrod v. Rohdenburg, 343 Ill. 318, 175 N. E. 379.

Defendant suggests that the chancellor erred in dismissing his counterclaim for divorce on the grounds of desertion and habitual intoxication for want of equity.

The record is absent of any proof of the charge of habitual intoxication. On the question of desertion, counter-plaintiff testified that he had asked his wife to come and live with him in Chicago. This she denied. His letters of August 16, 1956, and June 6, 1957, are suggested as indicative of his desire for his wife to live with him in Chicago. By his own testimony he was living with his wife in Crystal Lake until January 1, 1957, and that only since that date has he resided in Chicago. The letter of August 16 is not an invitation for her to come to Chicago for the purpose of resuming their marital life. The only suggestion of such a request would have to be found in the language of the letter which said, "You will find yourself all the necessary personal maintenance and support you need in Chicago, Illinois. *Details to be arranged later."* (Emphasis supplied.) We feel that this falls far short of a bona fide request that his wife live with him in Chicago. His letter of June 6, 1957, while asking her to come and live with him, was authored some four months after plaintiff had commenced her suit

for divorce or separate maintenance. The very tenor of the letter was self-serving at best.

Albeit the evidence would sustain the counter-plaintiff's allegation of desertion, the chancellor would have been in error in granting counter-plaintiff a divorce on that ground concluding as he did, and this court has, that the defendant counter-plaintiff was guilty of adultery as charged in the supplemental complaint as amended.

It has long been the rule of law in Illinois that a divorce on the grounds of adultery is not barred by a defense of cruelty, habitual drunkenness, desertion, or other statutory grounds for divorce, however, adultery is a good defense to any other statutory ground for divorce, including the charge of adultery. Stiles v. Stiles, 167 Ill. 576, 47 N. E. 867; Zimmerman v. Zimmerman, 242 Ill. 552, 90 N. E. 192; Nesheim v. Nesheim, 293 Ill. App. 257, 12 N.E.2d 222.

As late as Peck v. Peck, 16 Ill.2d 268, 157 N.E.2d 249, the Supreme Court said, "Furthermore, although Illinois recognizes the principle of recrimination which permits a defendant to show that a plaintiff is also guilty of such misconduct as would entitle the defendant to a divorce, adultery is an exception in that other grounds, such as cruelty will not bar a divorce for adultery."

Lastly, defendant contends that the court erred in continuing the temporary alimony and support order of December 17, 1958, by its decretal order of February 27, 1959.

While we have heretofore stated that this assignment of error was not before this court in that defendant's notice of appeal was limited to the granting of the divorce and the dismissal of the counterclaim, we do not deem it inadvisable to state our further reasons for so holding.

Orders for temporary alimony and support have long been recognized as appealable orders. Lane

v. Lane, 22 Ill. App. 529; Hochreiter v. Hochreiter, 138 Ill. App. 373; Gray v. Gray, 6 Ill.App.2d 571, 128 N.E.2d 602.

Section 50 (2) of the Civil Practice Act, Chap. 110, Sect. 50 (2) Ill. Rev. Stat. 1957, provides that where there are multiple claims for relief in an action, in the absence of an express finding by the court that there is no just reason for delaying enforcement or appeal, any order adjudicating fewer than all the claims is not enforceable or appealable and is subject to revision at any time before entry of an order, judgment, or decree adjudicating all the claims, rights, and liabilities of the parties.

No such express order was sought from the court's decree of February 27, 1959, relating to the temporary order of December 17, 1958.

In addition the decree expressly retained jurisdiction of all questions of alimony and support money raised by the pleadings still pending and ordered the defendant to comply with the order of December 17, 1958, until such time as the Court shall order otherwise.

We have carefully examined the record and are unable to find any reversible error. The decree is therefore affirmed and the cause remanded for the further consideration of the questions reserved by the court.

Affirmed and remanded.

DOVE, J. I concur in affirming the decree of the trial court.

McNEAL, J. Took no part in the consideration or discussion of this case.